**FOUR STAR COMICS CORPORATION,**
Plaintiff-Appellant-Appellee,

v.

**KABLE NEWS COMPANY,** Defendant-Appellee-Appellant.

**AJAX PUBLICATIONS, INC.,** Plaintiff-Appellant-Appellee,

v.

**KABLE NEWS COMPANY,** Defendant-Appellee-Appellant.

Nos. 265, 266, Docket 26467, 26468.

United States Court of Appeals
Second Circuit.

Argued Feb. 21, 1961.

Decided May 9, 1961.

As Amended June 1, 1961.

John M. Johnston, New York City (White & Case, and Charles F. G. Raikes, New York City, on the brief), for plaintiffs-appellants-appellees.

James R. Cherry, New York City (Hays, St. John, Abramson & Heilbron, Elias Messing, and Osmond K. Fraenkel, New York City, on the brief), for defendant-appellee-appellant.

Before HINCKS and MOORE, Circuit Judges, and BRENNAN, District Judge.*

HINCKS, Circuit Judge.

These are two companion cases brought by two publishers of "comic books" against their common, exclusive, distributor. The central issue in both is the interpretation of the distribution contracts; both contracts were prepared by Kable, the distributor, and are identical. It will be convenient to treat the two cases as one. The crucial contractual provisions are set out in the margin.[1]

\* \* \* \* \* \*

Plaintiffs-publishers brought these actions, contending that Kable credited itself for the price of millions of comic books which nonetheless were sold to the public in competition with the publishers' subsequent issues. The complaint sought in successive counts: (1) the purchase price (5¢ per copy) of all magazines delivered to Kable less payments actually made by Kable; (2) the purchase price of all magazines returned to Kable by its wholesalers which it did not destroy; (3) the purchase price of all magazines returned from wholesalers and then sold to other wholesalers; (4) the purchase price of all magazines which Kable did not return to Four Star after having been requested to do so;[2] (5)

---

\* Sitting by designation.

1. "Witnesseth:

1. The 'Publisher' Agrees:

\* \* \* \* \*

(e) To bill the 'Distributor' for copies of said publication delivered to 'Distributor's' wholesalers at the rate of five (5¢) cents per copy, payment to be subject to fluctuations in the rate of exchange, if any, at the time settlement is made, and to credit the 'Distributor' for all returned and unsold full copies, front covers and/or headings at the rate of five (5¢) cents per copy.

\* \* \* \* \*

2. The 'Distributor' Agrees:

\* \* \* \* \*

(b) To pay 'Publisher' the stipulated price for all copies of any issue of said publication delivered to 'Distributor's' designated wholesalers and not returned to 'Distributor' seventy days after sale date thereof after making deductions for all advances, all adjustments, allowances, indemnities and guarantees hereinabove provided for, and for all returned and unsold copies of the particular issue and of other issues which may have been delivered before, or after the issue for which settlement is being made. \* \* \*

3. Both Parties Further Agree:

\* \* \* \* \*

(c) That \* \* \* all loss, damage, or destruction of unsold copies and returns after they reach the 'Distributor' and before receipt thereof by 'Publisher,' shall be at the risk of and borne by the 'Publisher.'

(d) That \* \* \* the relationship between the 'Publisher' and the 'Distributor' is that of creditor and debtor.

(e) That the 'Distributor' may return to the 'Publisher' headings of front covers in lieu of full copy returns; that if 'Publisher' fails to maintain a suitable place for receiving said returns, or refuses to accept delivery thereof, the 'Distributor' shall be and it hereby is authorized to destroy or in any other manner dispose of said returns, at any time after thirty (30) days shall have expired from date of final settlement. In making final settlement on any issue of said publication, the 'Distributor' shall render a final statement setting forth the totals of all items of charges and credits provided for in this agreement or any amendment thereto, and the 'Publisher' agrees to accept same as an account stated and the items therein enumerated as true and correct \* \* \*.

(f) That in the event 'Publisher' requests full copy returns, 'Distributor' agrees to obtain the return thereof wherever and whenever in its judgment same is practicable."

2. There is no counterpart to this claim in the Ajax complaint.

damages for fraud.[3] The aggregate purchase price claimed as wrongfully withheld amounted to some $1,800,000.

Kable interposed three counterclaims, only one of which is in issue here. That counterclaim was based on the periodic statements sent to the publishers by Kable. These statements constituted an account stated under paragraph 3(e) of the distribution contract. Note 1 supra.

The district court interpreted paragraph 2(b) of the contract to entitle Kable to a credit of the purchase price for all copies which were returned to it from its wholesalers within the specified period. According to the district court's interpretation this right was absolute, no matter what happened to the magazines thereafter; fraud or any other possibility would not alter the situation. The court understood subparagraphs 3(c) and 3(e) of the contract to imply a duty in Kable to destroy or return to publishers those magazines which its wholesalers did not sell, but ruled that Kable's right to a credit under paragraph 2(b) was wholly independent of Kable's duty to return to the publishers or destroy. This interpretation of the contract apparently was based on the view that although the references to "unsold copies," "returns," "return," and "full copy returns," in paragraphs 3(c) and (e) meant, and impliedly required, returns from Kable *to the publishers*, of all copies "unsold" in the sense of "never sold to the public," the deduction from the purchase price provided by paragraph 2(b) "for all returned and unsold copies" became fully accrued upon *return to Kable*, the distributor.

Accordingly, the district court granted summary judgment to Kable on its counterclaim, since nothing was brought forward to show that Kable had taken cred-

its for any magazines other than those "returned" to it by the wholesalers to whom they were originally sent. And since the contract was so interpreted that the publishers were not entitled to the purchase price of copies returned to Kable, irrespective of what disposition was made of them thereafter, the complaint, which was based on claims for the purchase price, was thought not to state a claim upon which relief could be granted. Consequently, Kable's motion to dismiss the purchase price claims of the complaint was granted. Notwithstanding, since paragraph 3 of the contract demonstrated Kable's duty to return to the publisher or destroy, the district court allowed the publishers to go to the jury to recover "consequential" damages" for breach of that duty. By its answers to interrogatories propounded by the court, the jury found that Kable failed to destroy a substantial number of the magazines returned to it and that a substantial number of these were recirculated and sold to the public, with the effect of reducing the sales of each of the publishers' subsequent issues by 300,000 copies. The court took 5¢ per copy as the measure of damages (that being the sale price to the distributor under the contract). The resulting figure was set off against Kable's damages under its summary judgment on its counterclaim.

Publishers appeal from the dismissal of their purchase price claims and from the entry of the summary judgment for Kable. Kable cross-appeals from the set-off to its judgment measured by the jury's special verdict, on the ground that there was insufficient evidence to support the set-off.

■ We hold that the district court erred in interpreting the contract, and

---

3. The fraud claim is based on alleged misrepresentations relating to the copies returned and the state of accounts. It also turns, at least in part, on the interpretation of the contract.

There was still another claim alleging a conspiracy illegal under the antitrust laws. In response to the interrogatories submitted to it, see *infra* in text, the jury found that no such conspiracy existed and the conspiracy claim is not in issue on this appeal.

particularly paragraph 2(b) thereof, to mean that the distributor was entitled to a deduction for all copies returned to the distributor. Consequently, its dismissal of the purchase price claims and its entry of summary judgment on the counterclaim must be reversed, and the case remanded for a new trial. It is therefore unnecessary for us to deal with the questions presented by Kable's cross-appeal.

The contract itself, we think, contains solid internal evidence of the error in the interpretation adopted below. It is in three paragraphs. Paragraph 1 is headed "The Publisher Agrees"; Paragraph 2 is headed "The Distributor Agrees"; and Paragraph 3, "Both Parties Agree." Looking to paragraph 2(b), on which the interpretation below rested, it will be noted that the distributor's promise to pay the stipuated price is there stated to extend to "all copies * * * delivered to 'Distributor's' designated wholesalers and not returned to 'Distributor' * * * after making deductions [for several generally stated categories and] for all returned and unsold copies * * *." To understand the reach of all these several deductions one must turn to other provisions in the contract. Thus the deduction of paragraph 2(b) for "advances" is evidently referable to paragraph 3(g); that for "adjustments" to 1(c); that for "allowances" to 1(f) and 1(i), and that for "indemnities and guarantees herein above provided for" to 1(j).

By a similar process we must go outside paragraph 2(b) to find the definition of the deduction "for all returned and unsold copies." The 2(b) "deduction" which the distributor may make from his payments for returned copies is plainly referable to, and indeed reciprocal with, the publisher's promise in paragraph 1(e) "to credit the 'Distributor' for all returned and unsold full copies, front covers and/or headings * * *" which is there stated as a qualification of the agreement "to bill the 'Distributor'

for copies * * * delivered to 'Distributor's' wholesalers at the rate of five (5¢) cents per copy." This subparagraph [1(e)] apparently contemplates that, just as the billing shall extend to all copies *delivered by the publisher* to the distributor's wholesalers, the credit is to cover all copies *returned to the publisher* unsold. Indeed, it would scarcely be appropriate in the context of paragraph 1(e) to speak of copies "returned" by the original wholesalers to the *distributor* because the wholesalers had not received them from the distributor.

That the 1(e) "credit," and hence the 2(b) "deduction," extends only to returns *to the publisher* is further indicated by the language of 1(e) extending the credit not only to the return of "full copies" but also to "front covers and/or headings at the rate of five (5¢) cents per copy." To understand the reason for these alternative forms of return we must look to paragraphs 3(c), (e) and (f). Paragraph 3(e) speaks expressly of returns "to the Publisher": these are the returns that qualify for the "credits" provided in 1(e) and again referred to in 3(e).

Moreover, we think of some weight in support of our interpretation is the provision of paragraph 3(d) "that the relationship between the 'Publisher' and the 'Distributor' is that of creditor and debtor." This scarcely accords with the ruling below that as to part of the copies delivered by the publisher the distributor is a debtor but as to the remainder it is obligated not to pay the stipulated price but is only under some contractual duty to return. Instead, we hold, the provision contemplates that the distributor is a debtor for all copies delivered by the publisher but with an option to obtain a credit or make a deduction for those returned to the publisher.

All in all we are satisfied that the deduction provided in paragraph 2(b) extends only to unsold copies (or the contract equivalent) returned to the publishers.

**636**

We think the publishers are right in insisting that the contract contemplates a scheme of distribution along the following steps:

1. Shipment by publisher to Kable's wholesaler; then

2. Debit of Kable's account of 5¢ per magazine shipped; then

3. (a) Either sale by wholesaler to retailer to public, in which case Kable's duty to pay 5¢ per magazine becomes absolute,

(b) Or failure to sell within contractual period followed by return to Kable by wholesaler,

(c) Or return to Kable within contractual period and reshipment to second wholesaler, in which case step 3 begins again.

If the event delineated in 3(b) occurs, then

4. (a) Either return by Kable to publisher, in which case Kable's right to a credit becomes absolute,

(b) Or destruction by Kable when permitted by the contract as a substitute for return, in which case Kable's right to a credit becomes absolute.

The internal evidence so fully supports this scheme of distribution that there is no occasion to invoke the familiar rule that when "the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is the less favorable in its legal effect to the party who chose the words." 3 Corbin, Contracts § 559 at 262.

The fact that Kable's accounts constituted accounts stated is not conclusive. For notwithstanding, the publishers, in spite of their prior tacit assent, may attack the accounts by evidence of errors therein, but have the burden of showing in what manner the accounts are incorrect. 6 Corbin, Contracts § 1310 at 193.

Judgments in so far as appealed from are reversed and cases remanded.