**FOUR STAR COMICS CORP., Plaintiff,**
v.
**KABLE NEWS COMPANY, Defendant.**

**AJAX PUBLICATIONS, INC., Plaintiff,**
v.
**KABLE NEWS COMPANY, Defendant.**

United States District Court
S. D. New York.
Jan. 14, 1963.

———◆———

White & Case, New York City, for plaintiffs; John M. Johnston, Charles F. G. Raikes, New York City, of counsel.

Hays, St. John, Abramson & Heilbron, New York City, for defendants; James R. Cherry, Elias Messing, New York City, of counsel.

McGOHEY, District Judge.

These are companion cases by two publishers of comic books (Four Star and Ajax) against their common exclusive distributor (Kable) for alleged violation of identical distribution contracts. They seek to recover the purchase price of comic books sold to Kable and delivered to its designated wholesalers for which, in its periodic accountings to the publishers, Kable took credit as having been returned.[1] Both actions were tried together to the court without a jury. The court's findings and conclusions appear in the opinion.

Ajax and Four Star are New York corporations which, during the time here relevant, were engaged in the business of publishing comic books. Both are, in effect, corporate extensions of Robert W. Farrell who was the president and sole employee of each. He maintained a common corporate office for both corporations in an apartment in which he also resided, at 540 Park Avenue, New York City.

Kable is an Illinois corporation, having its principal place of business at Mount Morris, Illinois. It was and is in the business of distributing magazines of various kinds throughout the United States and foreign countries.

Farrell, through various corporations under his control, has been engaged in the comic book business since the mid-1940s. At about that time he became acquainted, through a publisher-distributor relationship, with George B. Davis, who was then employed by Publishers Distributing Corporation. In 1950 Farrell began to do business with Kable after Davis entered its employ. Davis subsequently became, and is now, the president of Kable.

Ajax, on June 17, 1955, and Four Star, on August 1, 1956, entered into identical written "Distribution Contracts" with Kable for terms of three years each.

The contracts, whose crucial provisions are set out in the margin,[2] were prepared

1. An earlier trial before another judge resulted in judgments which were reversed on appeal, 2 Cir., 289 F.2d 632.

2. "1. The 'Publisher' Agrees:

"(a) To and hereby does give and grant unto 'Distributor' the sole and exclusive right to sell and distribute its publication called [listing titles] throughout the world, except that 'Publisher' retains the right to sell copies thereof to individual subscribers, at regular subscription prices.

* * *

"(c) To regularly issue said publication during the term of this contract as hereinafter provided for.

"(d) To promptly deliver or cause to be delivered the specified number of copies * * * of each issue of said publication to each and every wholesaler designated by the 'Distributor,' in accordance with 'Distributor's' shipping instructions, and to pay all transportation costs, duties and charges thereon. 'Publisher' agrees to deliver bi-monthly the number of copies of each issue of said publication, as determined and ordered by the 'Distributor,' but unless otherwise fixed by the 'Distributor,' the total number of copies of each subsequent issue thereof shall be the same as that of the last issue thereof actually delivered by 'Publisher.'

"(e) To bill the 'Distributor' for copies of said publication delivered to 'Distributor's' wholesalers at the rate of five (5¢) cents per copy, payment to be subject to fluctuations in the rate of exchange, if any, at the time settlement is made, and to credit the 'Distributor' for all returned and unsold full copies, front covers and/or headings at the rate of five (5¢) per copy.

* * *

"2. The 'Distributor' Agrees:

"(a) To supply the 'Publisher' or its printer or forwarding agent, in ample time for distribution of each issue of said publication, with shipping instructions and labels designating the names and addresses of 'Distributor's' wholesalers and specifying the number of copies of the publication to be sent to each wholesaler, the number of copies to be based upon prior sales experience, if any.

"(b) To pay 'Publisher' the stipulated price for all copies of any issue of said publication delivered to 'Distributor's' designated wholesalers and not returned to 'Distributor' seventy days after off sale date thereof after making deductions for all advances, all adjustments, allowances, indemnities and

by Kable. The Court of Appeals has construed these as providing "a scheme of distribution along the following steps:

1. Shipment by publisher to Kable's wholesaler; then

2. Debit of Kable's account of 5¢ per magazine shipped; then

3. (a) Either sale by wholesaler to retailer to public, in which case Kable's duty to pay 5¢ per magazine becomes absolute,

   (b) Or failure to sell within contractual period followed by return to Kable by wholesaler,

   (c) Or return to Kable within contractual period and reshipment to second wholesaler, in which case step 3 begins again.

If the event delineated in 3(b) occurs, then

4. (a) Either return by Kable to publisher, in which case Kable's right to a credit becomes absolute,

   (b) Or destruction by Kable when permitted by the contract as a substitute for return, in which case

guarantees hereinabove provided for, and for all returned and unsold copies of the particular issue and of other issues which may have been delivered before or after the issue for which settlement is being made. The 'Distributor' shall have the right to fix any date as the off sale date of the last issue of said publication and shall make settlement on last issue one hundred twenty (120) days after the off sale date so fixed.

"3. Both Parties Further Agree:

"(a) That the cover price of said publication shall be ten (10¢) cents per copy.

* * *

"(c) That * * * all loss, damage, or destruction of unsold copies and returns after they reach the 'Distributor' and before receipt thereof by 'Publisher,' shall be at the risk of and borne by the 'Publisher.'

"(d) That * * * the relationship between the 'Publisher' and the 'Distributor' is that of creditor and debtor.

"(e) That the 'Distributor' may return to the 'Publisher' headings of front covers in lieu of full copy returns; that if 'Publisher' fails to maintain a suitable place for receiving said returns, or refuses to accept delivery thereof, the 'Distributor' shall be and it hereby is authorized to destroy or in any other manner dispose of said returns, at any time after thirty (30) days shall have expired from date of final settlement. In making final settlement on any issue of said publication, the 'Distributor' shall render a final statement setting forth the totals of all items of charges and credits provided for in this agreement or any amendment thereto, and the 'Publisher' agrees to accept same as an account stated and the items therein enumerated as true and correct, except as to any specific item or items

appearing therein to which 'Publisher' may object in writing within fifteen (15) days from the date of said final statement.

"(f) That in the event 'Publisher' requests full copy returns, 'Distributor' agrees to obtain the return thereof wherever and whenever in its judgment same is practicable.

"(g) That the 'Distributor' shall advance transportation costs based upon Second Class entry, and on delivery of each issue, make an advance payment equal to twenty-five (25%) percent of the gross billing of the particular issue in addition to transportation costs and forty-five days after on sale date to make an advance payment based on 75% of 'Distributor's' estimate of final sales, less all previous advance payments and charges, and to continue this method of making advance payments and of prepayments on subsequent issues if in the 'Distributor's' judgment the sales warrant them.

"(h) That in the event the advance payments and/or prepayments theretofore made shall exceed the net amount realized by 'Distributor' on the sale of any issue or issues of said publication, and in the event that there is no existing issue or issues of said publication, 'Publisher' agrees to pay 'Distributor' the amount advanced by 'Distributor' to 'Publisher' or for 'Publisher's' account, in excess of the net amount realized by 'Distributor' on the sale of any issue or issues of said publication. That in the event of a succeeding issue or issues of said publication 'Distributor' shall deduct the excess of said advance payments and/or prepayments from any advance payment or prepayment which 'Distributor' may be required to make on any succeeding issue or issues of said publication."

Kable's right to a credit becomes absolute."[3]

From July 1955 until December 1956, Ajax published and caused its printers, Keystone Magazine Press and others, to deliver to Kable's designated wholesalers for distribution to retailers, thirty-two issues of comic books. These amounted to 10,303,943 copies for which Kable thereupon, pursuant to the contract, became indebted to Ajax at the rate of 5¢ per copy.

From March 1957 through July 1958, Four Star published and caused its printers, Keystone Magazine Press and others, to deliver to Kable's wholesalers for distribution to retailers, seventy-eight issues of comic books. These amounted to 23,132,710 copies, for which Kable thereupon, pursuant to the contract, became indebted to Four Star at the rate of 5¢ per copy.

Although section 1(e) of the contracts provided that the publishers would bill Kable for all copies delivered to wholesalers, the bills were, in fact, sent by the printers. Thereafter Kable did all the accounting.

Kable's system for determining the number of unsold copies for which it took credit was not uniform throughout the United States. In all sections of the country other than metropolitan New York, Chicago, Cleveland, and San Mateo and Petaluma, California, the wholesalers accounted to Kable by reporting the number of unsold copies and sending to Mount Morris, presumably as verification, the headings of the covers stripped from the unsold copies. In Chicago, Cleveland, San Mateo and Petaluma, the unsold copies were not so mutilated. In those areas they were counted and de-

stroyed by the wholesalers in the presence of local Kable representatives who thereupon reported the number to Mount Morris. In the New York metropolitan area, the unsold whole copies were picked up from the wholesalers by Arrow Paper Co. (Arrow), a dealer in waste paper engaged by Kable to do so.[4] Arrow brought the unsold copies to one of its warehouses in Newark, New Jersey where, before being disposed of, they were counted by Kable employees who reported the totals to Mount Morris.

Arrow's main business was the collection and sale of wastepaper. Some of this it sold to paper mills and some it shredded and sold for packing purposes. Its only compensation for the services it rendered to Kable consisted of whatever profit it derived from disposing of the unsold magazines it collected.

On each of the 110 issues published by Ajax and Four Star, Kable rendered to the publishers a final statement which, after listing "copies purchased," "copies returned" and various other charges and credits, reported a balance either owing or receivable by Kable. All of these final statements were received by the publishers but neither of them objected "in writing within fifteen (15) days from the date of [any] said final statement" with respect to "any specific item or items appearing therein." Accordingly each final statement became an account stated, under paragraph 3(e) of the contracts. (Note 2 *supra*)[5]

Although not required by the contracts to do so, Kable also, upon the expiration of each 10-day period during the ninety days following the off-sale date of each issue, submitted to each publisher a "10 Day Return Report." These purported to show the number of "returns" made

3. 289 F.2d 636.

4. In 1951 its New York area wholesalers informed Kable that henceforth they would not strip headings from unsold magazines and would not re-deliver unsold magazines to Kable. Thereupon Ainger, Assistant to the President of Kable, and Salvatore Capriglione, the

owner of Arrow, entered into an arrangement pursuant to which Arrow picked up from the New York metropolitan wholesalers and brought to its warehouse the unsold copies of all magazines distributed by Kable.

5. 289 F.2d 634.

to Kable by its wholesalers within the previous ten days. Each 10 Day Return Report contained a certification by a Kable official that the "totals listed on this ten-day return record have been checked and found to be correct" and "that upon receipt of proper acknowledgment from the publisher, the returns as listed will be immediately destroyed." The report also provided a space for the publisher to sign the following statement: "We accept the totals as correct and authorize the destruction of the returns."

The "returns" and "copies returned" listed in both the final statements and the "10 Day Return Reports" consisted of the headings forwarded to Mount Morris, the whole copies destroyed by wholesalers in Chicago, Cleveland, San Mateo and Petaluma, and the whole copies picked up by Arrow in metropolitan New York.

Ajax and Four Star signed and sent back to Kable all the 10 Day Return Reports submitted to them prior to February 1, 1958, and thereby authorized Kable to destroy all the returns listed on those reports. Ajax ceased publication prior to February 1, 1958, and no 10 Day Return Reports were sent to it thereafter. Four Star continued publication after that date and received 10 Day Return Reports regularly thereafter up to October 23, 1958. These, however, were not signed and sent back to Kable.

On December 21, 1957, Farrell wrote Davis stating "arrangements have been made for the exportation of my publications" and directing that "effective immediately," all unsold Four Star comic books in specified areas "are to be returned to us in full copies with covers." He gave detailed instructions concerning the precise manner in which he wanted the unsold copies packaged and gave "Export Division, Four Star Comic Corporation, 345 Hudson Street, New York City, N. Y." as the address to which they were to be sent. He had previously "arranged for" the use of adequate space at that address. Farrell did not say how long this "arrangement" was to last and it was not otherwise shown.

On December 27, 1957, Davis replied rejecting Farrell's demand as impractical on grounds which were entirely reasonable. For example, he pointed out the great expense which Farrell's demand would entail and asked if Farrell was in a position to advance the funds necessary to defray this. He said Kable would not advance them "on your account as it stands now. Your account runs too close to the belt." Davis suggested that Farrell confer with him to see if some practical arrangement might be made. Farrell did not accept the invitation to confer. On the contrary, he wrote Davis on January 3, 1958, that he realized his request had been "untimely" and that "the whole idea was ill advised." He said he would "forget the entire thing at this time." He added that his interest in getting full copy returns was twofold: one, "naturally to sell them"; and, two, "to get them out of the second-hand market where they seem to fall. Your assurance to me that all my returns are destroyed to the best of your ability would satisfy me greatly." There was no reply to this from anyone on Kable's behalf.

Farrell next wrote to Kable at Mount Morris on March 24, 1958, by which time Four Star had ceased authorizing destruction of its returns. Farrell asked to be advised "where the returns you are holding for us are being maintained, so that we can compute the shipping charges and thereby facts [sic] upon which to decide whether it is practical for us to request full copy returns. * * *" This request was not answered by Kable.

On April 2, 1958, Ainger, Assistant to Kable's President, wrote Farrell asking that the ten-day reports sent to Four Star since February 1, be signed and forwarded to Mount Morris. This request was not answered.

An April 4, 1958, the instant suit by Four Star was commenced.

On May 13, 1958, Farrell again wrote Kable as follows: "We have received no

reply to our registered letter of March 24th, 1958, requesting information with respect to where our [Four Star] returns were being maintained. As stated in our letter we requested information to compute the shipping charges which are a significant factor in determining the number of full copy returns which we desire to obtain. It is for this reason that ever since February 1st, 1958, we have refused to authorize the destruction of any of our returns. It is most urgent that we receive this information by return mail as to precisely where are our returns for the New York City and Chicago areas." Kable did not reply to this letter.

On May 21, 1958, the instant suit by Ajax was commenced.

On June 14, 1958, Farrell wrote to Davis, as follows: "It has come to our attention that Kable News Company has caused and is causing to be collected in the New York metropolitan area full copy returns of Four Star Comic Corporation's publications. It has also come to our attention that these full copy returns have been and are now being stored in a warehouse located in Newark, New Jersey, which is owned and operated by S. Capriglione. As you know, we have declined to authorize the destruction of our publications ever since the 1st day of February 1958. Kindly let us know when and where we may pick up our full copy returns at the warehouse or how we can make arrangements to do so." Kable did not reply.

On September 26, 1958, Farrell, by registered mail, wrote to Kable's Mount Morris office, as follows: "As you know, since February 1st, 1958, we [Four Star] have refused to sign the 'authorizations to destroy returns' which you have been mailing to us. Kindly explain why you have failed to forward to us the headings of our publications, and further why you have failed to furnish us with information as to the whereabouts of full copy returns." Kable did not reply. The latter letter was Farrell's first inquiry concerning headings. His previous letters concerning returns dealt only with full copies.

The publishers contend that each final statement sent them by Kable prior to February 1, 1958, was materially false in that, in each Kable took credit for a substantial number of unsold copies which it had neither returned to the publishers nor destroyed. With respect to the period after February 1, 1958, Four Star contends that Kable's final statements were likewise materially false in that, in each, Kable took credit for a substantial number of unsold copies which it had not returned to Four Star and which it was not authorized to destroy.

The publishers are not precluded from attacking the final statements as false or erroneous by reason of their failure to challenge them within fifteen days from their respective dates. They have, however, the burden of showing in what respect the statements are false or erroneous.[6]

Seventy-six final statements were rendered during the period prior to February 1, 1958; 44 to Four Star and 32 to Ajax. They will be considered first. Insofar as they deal with the credits taken by Kable for unsold copies in the areas outside of New York, the plaintiffs failed to show that any of these statements was false or substantially erroneous. It was stipulated that if certain witnesses were called they would testify that Kable followed the system heretofore described in determining the number of unsold copies in those areas for which it took credit. And while the plaintiffs did not concede the truth of that testimony, they did not offer any evidence tending to contradict it or to discredit the prospective witnesses. I have, therefore, accepted the stipulated testimony as true and find accordingly. Insofar as they deal with credits taken by Kable in the New York area, the statements require further consideration. The total number of unsold copies in the New York area for which Kable took credit in the pre-February 1, 1958,

6. 289 F.2d 636.

statements was 1,195,843.[7] The publishers contend that these were not destroyed but, on the contrary, were delivered by Arrow to dealers in back dated issues of comic books who in turn sold them in the second-hand market. Before they were picked up by Arrow, wholesalers had caused 219,464 of these to be dyed. In this condition, these could not be resold and so, for all purposes here material, they were already "destroyed" when they were picked up. Accordingly, the number of credited copies in issue for the period prior to February 1, 1958, is 976,-379.

Arrow had two places of business in Newark. Its office was in a warehouse on Vesey Street, where it also had shredding and baling machines. Its other warehouse was about a block away on Delancey Street. It was to the latter that the unsold magazines picked up from Kable's wholesalers were usually taken. During the period that Kable distributed the comic books of Ajax and Four Star it also distributed comic books of two other publishers who were identified only as "St. John" and "Decker." The unsold copies of the latters' books were also brought to Arrow's Delancey Street warehouse but they, after being counted, were returned to their publishers. Kable did not distribute any other comic books in that period.

The wholesalers delivered to Capriglione unsold copies of the plaintiffs' and other publications distributed by Kable. They were tied in bundles of one hundred, together with invoices purporting to show the number of copies of each title returned. As a rule all the books in a bundle bore the same title. In some bundles, however, the titles were mixed. Twice each week these returns were checked against the invoices by Cohen, Kable's newsstand sales supervisor for the New York area. This checking was usually done at the Delancey Street warehouse but on occasion it was done at the Vesey Street warehouse. Cohen relied on the wholesalers' count for the bundles which contained only books of the same title and he did not break open these bundles. He opened the bundles which contained more than one title and verified the count as to each title in them. These odd lot copies were not retied in bundles. They were left loose on the floor. In doing this work Cohen had the assistance of Capriglione's employees. Under Cohen's direction the Decker and St. John returns were put to one side and later delivered to their publishers by Capriglione.

In the first step of their attempt to prove that the unsold copies of their publications were not destroyed, the plaintiffs called Capriglione and two employees of the Davey paper mill in Jersey City. Capriglione testified that after they were counted at his warehouse, all of the magazines he had picked up were destroyed; some by being shredded at his Vesey Street warehouse, some at the Davey mill, and some at the National Gypsum Company mill during one period of about two months when the Davey mill was shut down. Despite some confusion as to the number of times he brought magazines to the Gypsum mill, I find his testimony to be that he brought the great bulk of the plaintiffs' comics to the Davey mill.

Ole Monstery, a Davey employee for forty years, was the receiving clerk who checked loads of paper as they came into the mill yard. It was his duty to determine whether they contained "good paper" or "bad paper" but what tests he used were not disclosed. He testified that Capriglione delivered "magazines" both loose and in bundles to the mill every day and that they were all dumped in front of the "beater" inside the mill. Monstery had nothing to do with the magazines at that point, but he testified he often saw them and that, although he occasionally saw loose comics and comics in "bales," he never saw "bundles" of

7. The parties made no attempt to show how many of this total had been published by Ajax and how many by Four Star.

comics in Capriglione's loads either while they were still tied up or after they were cut

Raymond Reilly, a Davey employee for thirty-five years, was the "paper engineer" who supervised the operation of the pulping machine into which the magazines were dumped. He testified that between 1955 and 1958 he never saw comic books going into the hopper at the machine.

The plaintiffs, asserting that Monstery and Reilly are "disinterested third parties," argue that their "unquestioned testimony" alone justifies a finding that the unsold copies of the plaintiffs' comic books collected by Capriglione were not destroyed. This argument is rejected. It will be assumed that these two witnesses are disinterested for, despite the fact, as will later appear, that on at least one occasion Farrell told a man named Guyant from whom he sought helpful testimony that he would pay for it, there is no evidence that he paid or even offered a reward of any kind to either Monstery or Reilly. Monstery testified that he spent "no time at all"—only a "couple of seconds" examining the truck containing magazines; that a four ton truck loaded with bundled magazines would contain 800 bundles of which he could see only those on the surface; that these constituted only a small part of such a load; and that he could not distinguish a comic book from any other magazine merely by looking at its back cover. I accept this testimony and find accordingly. Furthermore, in all probability a substantial number of the magazines in a pile being pushed into the pulping machine either lay face down or were hidden in the pile. I find accordingly. Among the plaintiffs' publications were three entitled "Secret Love," "Bride's Diary" and "All True Romances." Monstery was unable to identify any one of these as a comic book. Moreover, when the plaintiffs' counsel, referring to these, asked him whether he had ever seen "any

books such as that, like that, in Capriglione's loads," he gave the following revealing answer: "Not to my knowledge. *I never examined them that close to make sure it was so and so or not so and so. It did not interest me one bit.*" (emphasis supplied) I accept that and find accordingly. Monstery's testimony does not show nor does it justify an inference that there were no comic books in the bundled magazines which Capriglione brought to the mill.

Reilly saw Capriglione's truck at the mill but he "never went near and seen what was on the truck." He didn't "inspect any bundled magazines." It was not his job to determine whether comic books were among the magazines delivered to the mill. Moreover he spent only a very small part of his time at the pulping machine, first, because he had other duties and also because, since his "helper" who actually pushed the magazines into the hopper of the machine "is supposed to know as much as I do," Reilly relied on his helper to feed the waste paper into the machine in the proper manner. Reilly's testimony does not show nor does it justify an inference that there were no comic books among the magazines delivered to the mill by Capriglione.

The plaintiffs next undertook to show that during the relevant period Capriglione sold whole copy returns of the plaintiffs' publications to Dave Korenman, a large scale dealer in second-hand comics; and that the latter then sold these to Bloomer Bennett, also a large scale dealer in "back-issue comic books and magazines" in Owensboro, Kentucky. The testimony as to these transactions came from a former employee of Korenman, Frank Wallace, who testified in person, and Bennett whose pre-trial deposition was read. Wallace was Korenman's shipping clerk from June 1955 until November 1956. He worked at 412 Greenwich Street, New York City, until September 1955 [8] and thereafter at 250 West

---

8. Wallace fixed the time as being "a month before [the warehouse] was torn down," an event he said occurred in October 1955.

Broadway, New York City. He said he saw Capriglione delivering comic magazines to the Greenwich Street address once a week between June and September 1955 and "maybe once" during the following year while he worked at 250 West Broadway. He also said he saw Arrow trucks deliver comic books to 250 West Broadway but he did not say on how many occasions. Capriglione admitted delivering comic books to Korenman's Greenwich Street place in 1955 but denied that any of these were among the publications here in issue. Wallace refused to specify what comics he saw Capriglione or his trucks deliver or by whom they were published. At the previous trial he had testified that the comics he saw delivered were published by Ajax, but the copy he then identified was not one of any issue published by Farrell during the period from June 1955 to November 1956. It is conceded that Kable distributed Ajax comics for Farrell prior to June 1955. In any event, the comics Wallace saw delivered by Capriglione in 1955 to 412 Greenwich Street could not have been any of those involved here because the first issue of the latter, October 1955, did not come out in time to have returns coming in during the months between June and September of that year. Wallace did not say when it was he saw Capriglione at 250 West Broadway during the balance of 1955 and up to November 1956. And, for all that appears that single instance may have occurred when Wallace first went to the latter address in October 1955. This also would be too early for returns of Ajax issues involved in this case to be coming in. After leaving Korenman's employ in November 1956 Wallace became a longshoreman on the North River docks. He said that on his way to and from work during 1957 he used to pass 250 West Broadway and that from time to time he saw Capriglione's trucks there. He, of course, did not see what if anything they may have delivered there. Wallace did not impress me as a reliable witness. His testimony does not justify an inference that Capriglione brought any of the whole copy returns here in issue to Korenman's warehouse.

Bennett "guessed'" he had purchased four or five million comic books from Korenman, including a "minimum of a couple million" in 1956, "possibly about half" in 1957 and "probably a million" in 1958. He was chiefly interested in getting a wide variety of titles; that is, he didn't care what they were as long as they were different. On two occasions about a year before the first trial, Bennett was visited in Owensboro by Farrell who inquired about his purchases from Korenman and his records concerning these. During one of the visits Farrell typed a letter which Bennett signed, stating that he had purchased "Ajax comic magazines from Korenman." After Bennett had signed the letter Farrell wrote underneath the signature, in ink, a list of seven of the Ajax titles allegedly purchased, which Bennett initialed. These were later included in a total of about twenty Ajax titles which, when copies of them were shown him during his deposition, he said he had purchased from Korenman. He had been asked at his deposition to produce all of his records concerning such purchases but at the trial only two invoices were introduced which he said evidenced sales of Ajax comics by Korenman to him. These related to two transactions in 1955; one on July 2 and the other August 25. On these dates, however, there could not have been any returns of even the earliest issue of Ajax comics distributed by Kable under the contract in suit. That would have been so even if that issue had been published as early as July 1955 and there is no evidence that it was. There is no statement in either of these invoices that any of the comics they cover were published by Ajax. Bennett nevertheless said he knew that some of them were Ajax publications because both invoices state that some of the comics were in bags and it was Korenman's practice to deliver only Ajax comics in bags although sometimes they were delivered in bundles as well. No reason

was suggested and none is apparent why Ajax comics should have been so carefully distinguished from those of other publishers, particularly in view of the fact that Bennett was not interested in whose publications he received but only in the variety of the titles. Wallace, whom one would expect to know about this practice if it in fact existed, was not asked about it. I find that the comics covered by the invoices of July 2 and August 25, 1955, were not any of those involved in these actions.

Bennett said he made other purchases of Ajax comics from Korenman but, as already noted, no record was produced from which it could be learned when such alleged purchases were made or how many copies or titles were involved. Bennett's testimony shows, at least, that his memory was singularly unreliable as to almost everything except his claimed purchases of Ajax comics from Korenman in the relevant period. Although I did not have the opportunity to observe him on the stand, I have no confidence whatever in his testimony. And, in view of its authorship and the circumstances in which it was prepared, his letter above referred to does not lead me to change that evaluation. I reject his testimony that he purchased Ajax comics from Korenman at any time after August 25, 1955. Bennett's total testimony does not show, or support an inference that, any of the plaintiffs' publications which Capriglione picked up in the period here relevant were sold to him or to any other second-hand dealer.

Three additional witnesses were called to testify concerning the disposition of the unsold copies of the plaintiffs' publications picked up by Capriglione in the period prior to February 1, 1958. One of these, Robert Brown, was called by the plaintiffs; the other two, George Guyant and Farrell, were called by the defendant. Brown described himself as a wholesale dealer in "closeouts and remainders," that is, books no longer currently "on sale" which are sold by their publishers at a fraction of their original price. Some time in April 1958 Farrell, introducing himself as "Arthur Schlesinger," called on Brown and said he wanted to buy 200,000 copies of Ajax comic books. Brown offered to try to obtain them for Farrell, but he was unsuccessful. The purpose of this testimony, apparently, was to lay the basis for an inference that it was common knowledge in the trade that back issues of Ajax comics were available in large quantities in the second-hand market. The argument seems to be that a dealer like Brown would not have undertaken to try to procure them unless he had reason to believe they were available. The first answer to this is that, as Brown testified, a man in his business will always try to execute a commission of this kind if there is a reasonable possibility of profit. As a rule, he said, all that need be done is to make a few inquiries either personally or by telephone. The second, and here more persuasive, answer is that, although Brown tried to do so, he was unable to find Ajax comics to fulfill "Schlesinger's" order.

George Guyant is also a dealer in second-hand magazines, including comics. His home is in New Jersey, near Atlantic City. Shortly before the previous trial, Guyant was visited by Farrell who apparently had learned from Wallace that Guyant had purchased second-hand comics from Korenman. Farrell's visit was preceded the night before by a telephone call to Guyant by a person calling himself "Katz" who asked for an appointment. On the following day Farrell came to Guyant's home and conferred with him in the presence of his niece, who testified at the trial. Farrell asked Guyant if he had any records showing purchases of Ajax comics from Korenman. When Guyant said he did not, Farrell concededly said in words or substance "That's too bad. You just lost yourself a house." I accept Guyant's testimony and find accordingly.

Farrell, significantly, was not called by the plaintiffs but by the defendant. He admitted the visit to Guyant. His attempt to explain his remark as something said in jest was quite unpersuasive and

is rejected. I find it was not said in jest. Farrell also testified that on an occasion which, though not fixed in time, must have been after these suits were filed and prior to the first trial, he visited Capriglione's warehouse in Newark. He was accompanied by his brother whose name, according to Farrell, was "Katz." Katz was represented, either by himself or by Farrell, as being engaged in a business in which he could use second-hand comics as premiums. Seeing copies of the plaintiffs' publications in laundry baskets, they asked Capriglione if these were for resale. Capriglione said they were not; that they were to be "returned to the publisher." Asked if "your purpose was to attempt to pay Mr. Capriglione for those magazines," Farrell testified, "I would say yes."

The only witnesses who tended to contradict Capriglione were Monstery, Reilly, Wallace and Bennett, whose testimony I have rejected. Capriglione, it is true, was the defendant's agent engaged to pick up and dispose of the unsold copies in the New York area and for that reason he might be thought to be interested in the outcome of this case as the plaintiffs suggest. But there is not a shred of evidence that he stands to profit by a judgment in the defendant's favor; or that he stood to profit more by selling the copies he picked up to second-hand dealers like Korenman than by selling to paper mills or as packaging material. I had the opportunity of observing Capriglione. I think he was a truthful witness. I accept his testimony that in the period prior to February 1, 1958, the unsold copies covered by the instant contracts which he picked up from wholesalers were either brought to paper mills or shredded at his own warehouse and sold for packaging.

The plaintiffs have wholly failed to carry their burden of showing that any final statement submitted prior to February 1, 1958, was false or erroneous in any respect. Accordingly, the plaintiffs' claims insofar as they relate to the period prior to February 1, 1958, are dismissed. This disposes of all of the Ajax claims against Kable.

Thirty-four final statements were rendered by Kable after February 1, 1958. These were all sent to Four Star, Ajax having ceased to publish in late 1956 or early 1957. These statements show that Kable took credit for 5,095,721 unsold copies of Four Star publications. 235,398 of these were whole copies from the New York area which Capriglione had preserved unmutilated. They were picked up by Farrell shortly after the previous trial and are no longer involved in these cases. The remainder is made up of 4,739,021 copies the cover headings of which were sent to Mount Morris by wholesalers in areas other than New York, Cleveland, Chicago, San Mateo and Petaluma, in accordance with the practice heretofore described, and 121,302 copies which, in accordance with that practice, were destroyed in Cleveland, Chicago, San Mateo and Petaluma. Accordingly, the total of credited copies in issue for the period subsequent to February 1, 1958, is 4,860,323. None of these were returned to the plaintiffs in any form.

The sections of the distribution contracts which govern the form in which returns were to be made are 1(h), 3(e) and 3(f).[9] Section 3(e) gives the distributor the choice of returning "headings of front covers in lieu of full copy returns" unless pursuant to section 3(f) the publisher requests full copy returns and the distributor deems this to be "practicable"; in which event full copies are to be returned by the distributor *if* the publisher pays all the "necessary costs, expenses and transportation charges in connection with obtaining full copy returns" as provided in section 1(h). In his letter of December 27, 1957, to Farrell, Davis pointed out that the condition of the plaintiffs' accounts did not justify any advances by Kable to defray such costs, expenses and charges; and this was not challenged by Farrell. As far as appears,

9. Note 2 supra.

the plaintiffs' credit did not improve thereafter, and there is no evidence that the plaintiffs made arrangements to pay these charges. Accordingly, I hold Kable was not obliged to make full copy returns of the 121,302 books which were not sold in Cleveland, Chicago, San Mateo and Petaluma. Kable, nevertheless, was obliged to return the headings of these books in lieu of the full copies unless it was excused from doing so under other provisions of the distribution contract.

Since the plaintiffs did not sign any "10 Day Return Reports" after February 1, 1958, Kable's only source of authority to destroy returns after that date was section 3(e) of the distribution contract. The authority there granted was limited. It could be exercised only after thirty days had passed since the date of the final statement respecting the returns to be destroyed; and even then, only if the plaintiffs "[failed] to maintain a suitable place for receiving said returns, or [refused] to accept delivery thereof."[10] The plaintiffs did not "refuse to accept delivery" of either full copies or headings and it was not shown they ever advised Kable that delivery would be refused if attempted. Kable, nevertheless, contends it was authorized to destroy all returns whether in the form of full copies or headings, because the plaintiffs' place of business, an apartment in a section of New York City admittedly restricted to residential use, was not "a suitable place for receiving said returns." Kable, whose burden it was to sustain this contention, failed to do so. It seems quite obvious that the "suitable place" provision was not inserted in the distribution contracts because of aesthetic considerations. Its purpose was obviously the highly practical one of saving the distributor the trouble and expense of storing returns of whatever kind, the delivery of which, even though not "refused" by the publisher, could not in fact be effected; as for example in the event the publisher had only a mailing address. The 4,739,-

021 headings accumulated after February 1, 1958, were still in Kable's possession at the instant trial.[11] They fill 150 bags, each of which is approximately $3\frac{1}{2}$ feet high and $2\frac{1}{4}$ feet wide. If headings from the 121,302 destroyed copies had been preserved, they would fill three additional bags of similar size. These returns were accumulated over a period of nine months, so that the average monthly delivery would have consisted of seventeen bags. The apartment which served as the plaintiffs' offices consisted of twelve rooms, nine of which were used for offices and work rooms. This certainly was sufficient space to accommodate seventeen bags of the stated size at one time. It was not shown that delivery of such material was proscribed by any regulation of the management at 540 Park Avenue. Kable urged a further contention concerning the headings, namely, that to be "suitable," the place where they were to be received ought to have personnel and equipment for counting them. The contract, however, says nothing whatever about how the publisher had to deal with the headings after receiving them. Both of Kable's contentions concerning delivery of the headings to the publishers are rejected.

I find that the plaintiffs' place of business at 540 Park Avenue, New York was, within the meaning of the distribution contracts, a "suitable place for receiving" returns in the form of headings. I further find that Kable did not fail to return the headings after February 1, 1958, because of the claimed lack of "suitability" of the plaintiffs' place of business. That claim certainly has no validity with respect to the 345 Hudson Street address. Davis conceded that the space there was adequate for the receipt of full copy returns. It, therefore, was necessarily adequate for headings also. The true reason why Kable did not send the returns to the plaintiffs was Kable's asserted belief that under the distribution

10. Note 2 supra.

11. Kable offered to deliver them to Four Star during and also at the conclusion of the trial. The offer was refused as being made too late.

contracts it was not required to do so in order to be entitled to take credit for them. After the Four Star suit was commenced in April 1958 the desire to "preserve evidence" was probably an added reason.

If the foregoing stood alone, Four Star would be entitled to recover the purchase price of the copies for which Kable took credit in the period after February 1, 1958. It has already been held, however, that each of the thirty-four final statements submitted by Kable after February 1, 1958, became an account stated. Four Star, therefore, is bound by them unless it can show that they or some of them are fraudulent or erroneous. Four Star contends, first, that these statements never became accounts stated and, second, that even if they did they now have been shown to be false and are therefore not binding on it. In support of the first contention, Four Star, though conceding in its post-trial brief "that no letter specifically objecting to the accounts *per se* was sent to Kable," (emphasis in original) urges that "the most vigorous objection was raised as to the accounts by plaintiffs as soon as they discovered that Kable was violating its contracts. This objection was in the form of the complaints brought in these actions, the first of which was filed by Four Star on April 4, 1958." This contention does not survive examination and is rejected. Putting aside the obvious inquiry whether objection made in such form would satisfy the conditions so precisely detailed in section 3(e) of the distribution contract and assuming that it would, the Four Star complaint filed on April 4, 1958, did not "object" to any final statement rendered *after* February 1, 1958. That complaint sought to recover only for the copies for which Kable had taken credit in the forty-four final statements rendered to Four Star *prior* to February 1, 1958. The thirty-four final statements rendered *after* that date were not "objected to" by a "complaint brought in these actions" until Four Star filed its amended complaint on December 12, 1958. This, however, was much longer than fifteen days after the last of the post February 1 final statements was rendered on October 23, 1958. With respect to the second contention, there is not a shred of evidence that Four Star was misled by anything in the final statements submitted after February 1, 1958. The only claim of fraud or error is that Kable took credit for copies for which no returns were made to Four Star either in the form of full copies or headings. But certainly there was no deception here; nor any error which was not obvious to Four Star on the face of each statement. No one knew better than Farrell that none of the copies for which credit was taken in any of those final statements had been returned by Kable. Nevertheless, with full knowledge of all the facts, Farrell acting for Four Star made no objection within the time fixed by the contract. Four Star is bound by the accounts. Sea Modes v. Cohen.[12] Accordingly, all of Four Star's claims with respect to the period after February 1, 1958, are dismissed.

The unimpeached accounts stated between Kable and the plaintiffs show balances of $7,253.01 and $15,345.14 due to Kable from Ajax and Four Star, respectively, for which Kable seeks recovery by way of counterclaim in the respective actions. Kable is entitled to judgment in its favor on its counterclaim in each action, with interest. In the previous trial May 28, 1958, was fixed without challenge as the date from which interest was to run on the amounts recovered on the counterclaims. Although the subject was not discussed either at this trial or in post-trial briefs, it is assumed that the parties are in agreement that this is the appropriate date. Accordingly, Kable is entitled to interest from that date on the amount recovered on its counterclaim in each action.

Judgment may be entered in each action in accordance herewith.

12. 309 N.Y. 1, 127 N.E.2d 723. See also 1 C.J.S. Account Stated, § 51d.