**ALLY & GARGANO, INC., Plaintiff,**

v.

**COMPREHENSIVE ACCOUNTING CORP., Defendant.**

**No. 84 Civ. 7928 (RWS).**

United States District Court, S.D. New York.

Aug. 12, 1985.

Davis & Gilbert, New York City, for plaintiff (Miles Baum, New York City, of counsel).

Burke & Burke, New York City, for defendant (Michael A. McElroy, Robert J. Marvin, New York City, of counsel).

## OPINION

SWEET, District Judge.

Plaintiff Ally & Gargano, Inc. ("Ally"), a New York advertising agency, commenced this diversity suit against defendant Comprehensive Accounting Corp. ("Comprehensive") to recover the balance allegedly due to Ally for advertising services rendered and monies expended on behalf of their client Comprehensive. Ally has now moved for summary judgment under Rule 56, Fed.R.Civ.P. On the following findings and conclusions, the motion is granted.

Pursuant to an agreement dated on June 3, 1981 (the "Agreement"), between 1981 and 1984 Ally performed a variety of advertising services for Comprehensive including the creation and production of three television commercials. Ally periodically provided Comprehensive with estimates of anticipated costs to Comprehensive of commercials. According to Comprehensive, based on its prior experience with another advertising agency, it understood that the estimates included the cost of talent for the production of the commercials. Employees of Comprehensive inquired about whether additional payments might be required to enable Comprehensive to broadcast the commercials and they were told by Ally that any payments would be insignificant. According to employees of Comprehensive, no one from Ally advised Comprehensive that they would have to pay holding fees to each actor in each commercial if the commercial was not aired to prevent her or him from appearing in a commercial for a competitor and residual fees to each actor in each commercial every time the commercial was aired. In reliance on the estimates provided by Ally, Comprehensive approved the production of the commercials.

In December 1981, Comprehensive first received notice that it would have to pay holding fees and residual fees. According to employees of Comprehensive, they re-

peatedly questioned various employees of Ally regarding the amounts of the notices. Apparently Ally suggested that if Comprehensive did not pay the fees it would not be able to air the commercials and would risk losing its entire investment in the commercials. According to Comprehensive, it made a business decision to pay the fees rather than lose its investment.

Ally and Comprehensive continued their advertising relationship over the next three years during which Comprehensive paid over $200,000.00 in holding fees and residual fees for the commercials produced by Ally. Ally received a 17.65% commission on all of the fees billed.

By a letter dated September 25, 1984, Amil Gargano ("Gargano"), President and Chief Executive Officer of Ally, informed Comprehensive that it was terminating the Agreement. Ally then sent Comprehensive a statement of account dated September 30, 1984 indicating that Comprehensive had a balance due of $88,633.69. On October 4, 1984, Leo Lauzen ("Lauzen"), Chairman of the Board of Directors·and Chief Executive Officer of Comprehensive, wrote Gargano a letter stating that he understood Ally's decision to terminate their relationship, that he regretted that Comprehensive had fallen delinquent and that their delinquency was due to the fact that they had been too lenient in collecting receivables from their franchisees. He also suggested that Comprehensive pay an interest rate of 10% effective as of that date on the balance due, and indicated that the earliest that Comprehensive could start payments would be January or February, 1985 and that they planned to pay off the balance and the interest in twelve months.

By letter dated October 25, 1984, Harold Weston ("Weston"), the Chief Financial Officer of Ally, confirmed a conversation that he had with Paul Peterik ("Peterik"), the

Chief Financial Officer of Comprehensive regarding the unpaid balance. In the letter, Weston proposed specific terms by which Comprehensive might pay the balance due. He informed Comprehensive that if it could not agree to these terms and did not send the initial payment by bank wire to Ally's bank account, Ally would withdraw the proposal and would commence suit to collect the balance due.

Peterik responded by letter dated October 30, 1984, informing Weston that Comprehensive would not be able to meet the terms of the proposal. However, he also told Weston that he had wired $3,000.00 into Ally's bank account as a good faith payment and that Comprehensive planned on making weekly payments. This payment reduced the balance due to $85,-633.69, the total sum which Ally now wishes to receive from Comprehensive.

In November 1984, Ally commenced this suit against Comprehensive seeking to recover $88,663.69.[1] (Thereafter, Ally received the $3,000.00 payment from Comprehensive reducing the balance to $85,633.69.) In response to Ally's motion, Comprehensive asserts that the money is not due because Ally withheld information from Comprehensive, thus misrepresenting the situation regarding the production and cost of the television commercials and breaching the Agreement. Comprehensive claims to have raised questions of material fact as to Ally's performance under the Agreement sufficient to defeat the motion for summary judgment.

■ An examination of the course of business relations between Ally and Comprehensive indicates that Ally is entitled to judgment under an "account stated" theory.[2] Under federal and New York law, an " 'account stated' refers to a promise by a debtor to pay a stated sum of money which

---

1. The October 25, 1984 letter from Weston referred to the unpaid balance as $88,583.57. However, the statement of account submitted by Ally, as well as papers submitted in this case, refer to the balance due prior to the $3,000.00 payment as $88,633.69 and Comprehensive has not contested the amount in its papers.

2. Although the "account stated" theory is not delineated as such in the parties' papers, the papers raise the issues relevant to the theory and it was specifically raised and argued at oral argument by both parties.

the parties had agreed upon as the amount due. .... The promise may be either express or implied but it 'must be founded on previous transactions creating the relationship of debtor and creditor'." *Luckenbach Steamship Company v. United States,* 189 F.Supp. 309, 311 (1960). *See also Wayne County Vinegar & Cider Corp. v. Schorr's Famous Pickled Products, Inc.,* 118 Misc.2d 52, 460 N.Y.S.2d 209, 213 (1983).

■ An account stated may be implied when a creditor sends a statement of an account to a debtor and the debtor, who has a duty to examine the statement to ascertain whether it is correct or not, keeps it for a reasonable time without objecting to the correctness of the account. *Rosenman Colin Freund Lewis & Cohen v. Neuman,* 93 App.Div.2d 745, 461 N.Y.S.2d 297 (1983); *Boston & Maine Railroad v. Lehigh New England Railroad Co.,* 188 F.Supp. 486 (1960). An agreement may also be implied from the fact that the debtor makes a partial payment towards reducing the balance of the account. *Chisholm-Ryder Company, Inc. v. Sommer & Sommer,* 70 App.Div.2d 429, 421 N.Y.S.2d 455 (1979).

■ If an account stated can be established, the agreement is binding on both parties and must be enforced at law unless the debtor can show that some or all of the accounts stated are fraudulent or erroneous. If the debtor can establish that he was misled as to the amount properly due by the creditor's actions or by anything in the statements of account, he will not be bound by the agreement. *Four Star Comics Corp., v. Kable News Company,* 224 F.Supp. 108 (1963), *affirmed,* 327 F.2d 287 (2d Cir.1963); *Rosenman Colin Freund Lewis & Cohen v. Neuman, supra.*

■ The undisputed facts presented here indicate that an account stated was established between Ally and Comprehensive. When Ally terminated the Agreement it forwarded a statement of account to Comprehensive indicating the balance owed on its account with Ally. In the series of letters which Comprehensive subsequently sent to Ally, Comprehensive never objected to the accuracy of the statement of account or the adequacy of the services and information provided by Comprehensive over the past three years. Indeed, Comprehensive expressed assurances that it would try to pay the balance due and made a partial payment towards reducing this balance, thereby openly acknowledging that it owed Ally the balance due.[3] *See Rosenman Colin Freund Lewis & Cohen v. Neuman, supra.*

Comprehensive now claims, however, that it challenged several of the estimates and notices that Ally provided during the course of its business relations with Ally and that Ally withheld crucial information regarding the production and cost of the television commercials. Comprehensive argues that Ally misled Comprehensive and breached the Agreement and that therefore Comprehensive is not bound to pay the balance due.

■ However, even though Comprehensive may have questioned the accuracy of the estimates and notices before the final statement of account was submitted by Ally to Comprehensive, this is not enough to avoid liability under an account stated theory. Comprehensive had received and questioned previous estimates and notices and was fully aware that the final statement of account included payments due for

---

3. In an affidavit submitted in opposition to the present motion, Peterik asserts that when he spoke with Weston in October of 1984 and subsequently made the $3,000.00 payment he was unaware of the fact that there had been objections raised as to Ally's billing. In another affidavit, however, Peterik's superior, Lauzen, stated that he was fully aware of Comprehensive's objections at the time he wrote the October 4, 1984 letter indicating Comprehensive's intention of paying the balance due. Even assuming that knowledge of the objections of various Comprehensive employees, including its chief executive officer, should not be attributed to Peterik, his ignorance of Comprehensive's position does not affect either the creation of the account stated or Comprehensive's claims of fraud, since Lauzen's letter in and of itself establishes that Comprehensive agreed to pay while fully aware of the basis for the statement.

holding fees and residual fees Ally's commissions on those fees. Despite this knowledge, Comprehensive openly acknowledged that it owed Ally the balance due upon receipt of the final statement.

Further, there is no suggestion that Comprehensive received additional information after the account stated was established which indicated to Comprehensive that the account was fraudulent or erroneous or that Ally had otherwise mislead Comprehensive. Because Comprehensive agreed to pay the balance due with full knowledge of the basis for that balance, it cannot now raise the defense that Ally withheld information and misled Comprehensive as to the charges included in that statement. *See Rosenman Colin Freund Lewis & Cohen v. Neuman, supra. See also Kohl Madden Printing Ink v. Goshen Litho, Inc.,* 94 App.Div.2d 660, 462 N.Y. S.2d 462 (1983). Comprehensive claims that it objected to the estimates and notices prior to receipt and acquiescence to the statement of account are not sufficient to rebut the showing that an account stated existed.

For the reasons discussed above, Ally's motion for summary judgment is granted and the case is dismissed in its entirety. Submit judgment within ten (10) days.

IT IS SO ORDERED.