**In re ROCKEFELLER CENTER PROPERTIES and RCP Associates, Debtors.**

**Bankruptcy Nos. 95–B–42089 (PCB), 95–B–42088 (PCB).**

United States Bankruptcy Court, S.D. New York.

Oct. 8, 1999.

Swidler Berlin Shereff Friedman, L.L.P., New York City, by Earl H. Nemser, Gary J. Mennitt, for the Reorganized Debtors.

Morgan Lewis & Bockius, New York City, by Henry L. Goodman, William H. Schrag, for The Chase Manhattan Bank.

*MEMORANDUM DECISION GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF THE DEBTORS DISALLOWING PART OF THE CLAIM OF THE CHASE MANHATTAN BANK*

PRUDENCE CARTER BEATTY*, Bankruptcy Judge.

The debtors are the former owners of the world famous Rockefeller Center building complex in New York City. In September 1995, Chemical Bank filed a timely proof of claim for $7,827,512 in alleged overpayments of rent escalation charges dating back to 1989 under leases for space in the complex.

* Formerly known as Prudence Beatty Abraham.

The debtors filed an objection to the proof of claim, coupled with a motion for partial summary judgment relating to the years 1989 through 1993 on the grounds, *inter alia,* that the claim for those years was barred by the doctrine of "account stated." The claimant has opposed the grant of partial summary judgment motion on legal grounds. In addition, the claimant urges that consideration of the partial summary judgment motion is premature because it has not yet completed discovery of the debtors' books and records or deposed its former employees.

Based on the findings of facts and conclusions of law which follow, the court grants the motion for partial summary judgment and finds that the claim for the lease years 1989 through 1993 should be disallowed.

## FINDINGS OF FACTS [1]

### The Parties

1. On May 11, 1995 (the "Filing Date"), Rockefeller Center Properties ("RCP") and RCP Associates ("RCP Associates") (the "Reorganized Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code").

2. Prior to confirmation, RCP Associates was the owner or ground lessee of most of the buildings which make up the multi-building Rockefeller Center complex (the "Buildings").[2] Its affiliate, RCP, was primarily responsible for the management and operation of the Buildings.

3. On May 29, 1996, the Reorganized Debtors confirmed a joint plan of reorganization. The effective date of the joint plan was July 17, 1996. The confirmed plan provided for the Reorganized Debtors to transfer their ownership interests in the Buildings to a designee of the first mortgagee on the effective date. All leases were assumed by the designee and Tishman Speyer Properties ("Tishman") was hired as the new managing agent for the Buildings. The terms of the joint plan of reorganization provided for the payment in full of allowed pre-petition claims.

### The Proof of Claim

4. The bar date for the filing of claims was September 13, 1995.

5. Prior to the bar date and on or about September 12, 1995, Chemical Bank ("Chemical") filed a proof of claim in the amount of $7,827,512 (the "Proof of Claim"). *See* Exhibit 2 to Carroll Affidavit.[3]

---

1. The court's findings of fact are based on the Amended Joint Statement of Undisputed Facts submitted by the parties on January 14, 1998 ("Amended Joint Statement")(Case Doc. No. 926) as required by Local Bankruptcy Rule 7056 and as supplemented by this court's requirement that the proposed findings of fact be presented in a single document containing both parties' factual positions, with comments detailing any disagreement on a particular finding. *See In re CIS Corp.,* 188 B.R. 873 (S.D.N.Y.1995). Presentation in a single document facilitates this court's ability to discern the disputes between the parties and the reasons for those disputes. The single document requirement also eliminates petty disputes over language and reveals more clearly the disagreements of substance.

The court has incorporated only so much of the Amended Joint Statement as it finds relevant and necessary for resolution of the motion for partial summary judgment. Only a brief synopsis of the claimant's assertions regarding the errors in the calculation of the rent escalations has been included in the findings of fact because it is adequate to outline the claimant's contentions. In addition to findings of fact based on the Amended Joint Statement, the court has also made findings based on the papers submitted by the parties, as well on documents in the Chapter 11 case file.

2. The actual ownership and ground lease arrangements for all of the buildings in Rockefeller Center is complex and is not material to this matter. Indeed, a few of the buildings considered part of the complex have long had other owners.

3. The Affidavit of Stephen R. Carroll, Chief Financial Officer of Rockefeller Center Management Corporation, sworn to on November 13, 1996 ("Carroll Affidavit")(Case Doc. No. 784) contains as exhibits many of the documents relied on by the court in these factual findings.

6. The Proof of Claim states that it is based on six leases. Chemical was the original lessee on one of the leases and Manufacturer's Hanover Trust Company ("MHT") was the original lessee on three others. It has been agreed that a fifth lease referenced in the Proof of Claim is no longer a basis for the Proof of Claim. As to the sixth lease, neither of the Reorganized Debtors was the landlord and they therefore cannot have any liability on it.[4] The claimant has failed to offer any evidence to overcome the Reorganized Debtors' denial of any relationship to this lease. Chemical succeeded to the interests of MHT by virtue of a merger between the two institutions that occurred in 1991. Subsequent to the filing of the Proof of Claim, Chemical and The Chase Manhattan Bank ("Chase") merged and Chase is now the holder of the Proof of Claim.

7. The cover page of the Proof of Claim is Official Form 10 with the various answers filled in. Answer No. 1 states the basis of the claim by checking the box "other" and adding the words "Tenant Refunds." Answer No. 2 states the date the debt was incurred as "1989–1995." Answer No. 5 states the Total Amount Claimed as "$7,827,512." Attached to the first page is an additional five page typed document headed "Proof of Claim." It is essentially an amplification of the information found on the first page. Paragraph 2 states the amount of indebtedness as of the commencement of the bankruptcy cases as "$7,827,512 plus accrued and accruing interest, attorneys' fees, late charges, overdrafts and other sums and charges as provided for in the agreements between Chemical and the Debtors." The consideration for the Proof of Claim and the basis of the Debtors' liability to Chemical is stated to be the following: "Chemical was and still is a tenant of the Debtors under various leases of commercial real estate entered into with the Debtors or their predecessors in interest. Under the

terms of each of the leases for these facilities, Chemical is entitled to certain refunds for overpayment of escalation expenses and taxes, as well as additional items included in the rental payments made by Chemical to the Debtors." The next paragraph, paragraph 3, itemizes the various leases. In paragraph 4, Chemical acknowledges that it is still a tenant under only one of the leases but reserves its right to "offset the amount due under this Proof of Claim against all future rentals payments due under the aforesaid lease." Paragraph 6 states "[t]he Documents upon which this Claim is founded are voluminous and will be furnished upon request." There is no schedule attached or any information provided that explains how the number of $7,827,512 was computed. Nor is there attached any list of the voluminous "documents upon which this Claim is founded".

8. The Reorganized Debtors filed an objection to the Proof of Claim on or about November 14, 1996 and joined a motion for partial summary judgment as to the portion of the Proof of Claim for lease years 1989–1993 and a motion requesting a stay of discovery pending determination of the motion for partial summary judgment.

9. At a hearing held on September 9, 1997, the court stayed further discovery of the Reorganized Debtors' books and records or personnel for the years 1989–1993 on the grounds that (a) the discovery would be costly and labor intensive and (b) the discovery for those years would become irrelevant if the motion for partial summary judgment were decided in favor of the Reorganized Debtors. *See* Transcript of September 9, 1997 Hearing (Case Doc. No. 905).

10. On January 20, 1998 the court heard oral argument on the motion for partial summary judgment. At that hearing the court advised the parties that it was also viewing the motion for partial summary judgment as a motion to dismiss

---

4. This lease was dated January 23, 1989 and was between Rock–75 Plaza, Inc., as landlord, and Chemical, as tenant, for Shop A on the street level of 75 Rockefeller Plaza.

the Proof of Claim for failure to plead monies paid by mistake with particularity as required by Federal Rule of Civil Procedure ("FRCP") 9(b), made applicable by Bankruptcy Rule ("BR") 7009. The parties were given thirty days to make additional submissions. Each party did so and the motion for partial summary judgment was taken under advisement.

### The Leases

11. The remaining four leases (collectively, the "Leases") on which the Proof of Claim is based are as follows:

(i) Lease dated January 8, 1980 which expires on December 31, 2000, for office space at 600 Fifth Avenue, New York, New York under which MHT was the original tenant (the "MHT 600 Fifth Avenue Lease");

(ii) Lease dated August 22, 1972 which expired prior to the Filing Date and on September 30, 1994, covering certain bank branch space at 30 Rockefeller Plaza and 1250 Avenue of the Americas, as amended, under which MHT was the original tenant (the "MHT 30 Rockefeller Plaza Branch Lease"); and

(iii) Lease dated February 27, 1979 which expired prior to the Filing Date and on September 30, 1994, covering office space at 30 Rockefeller Plaza and 1250 Avenue of the Americas, as amended by a Supplemental Indenture dated as of June 8, 1986 under which Chemical was the original tenant (the "Chemical 30 Rockefeller Plaza Office Lease");

(iv) Lease dated February 6, 1989 which expired prior to the Filing Date and on September 30, 1994, for space at 1230 Avenue of the Americas under which MHT was the original tenant (the "MHT 1230 Avenue of the Americas Lease").

5. In fact, almost all of the 600 commercial tenants in Rockefeller Center had a provision for additional rent in their leases. *See* Carroll Affidavit at ¶ 6.

6. The relevant Base Years (or base amount) for each of the Leases are as follows:

### Additional Rent Escalation Statements

12. Each of the Leases provided for the payment of a stated annual rent, to be paid in monthly installments throughout the year. In addition, each lease provided for the payment of additional rent (the "Additional Rent").[5] The method for calculation and payment of the Additional Rent, for which a base year or amount was stated in each Lease, was set forth in each Lease.[6] During the lease year, the Additional Rent to be paid each month was one-twelfth of the final amount of the Additional Rent for the prior year, with the final amount of the current year's Additional Rent to be fixed after the end of the lease year. Shortly after the end of each lease year, the Reorganized Debtors calculated the actual amount of the Additional Rent due for the just-ended lease year and sent a year-end Escalation Statement to the tenant showing the actual amount of Additional Rent due and the adjustments that were due in favor of the landlord or tenant as appropriate. Each Lease contains identical provisions for the "prompt" payment of the estimated Additional Rent during the lease year and the final adjusting payment upon the tenant's receipt of an Escalation Statement as follows:

"The [1/12] installment [of the Additional Rent payment] for each calendar month [is] to be due and payable *promptly* upon receipt from the Landlord of a bill for the same; it being understood that if, as finally determined, the amount of additional rent payable by the Tenant to the Landlord * * * shall be greater than (resulting in an underpayment) or be less than (resulting in an overpayment) the aggregate of all the installments so paid on account to the

| Lease | Base |
| --- | --- |
| 600 Fifth Avenue Lease | 1979 |
| 30 Rockefeller Plaza Office Lease | 1978 |
| 30 Rockefeller Plaza Branch Lease | 1972 |
| 1230 Avenue of the Americas Lease | The base amount is set at $16.195 per square foot. |

Landlord by the Tenant for such Computation Year, then, *promptly* after receipt of the Escalation Statement for such Computation Year and, in performance of its obligations under [the lease] the Tenant shall, in the case of such an underpayment, pay to the Landlord an amount equal to such underpayment * * *." *See* Article 24 of each Lease.[7] (Emphasis added).

13. Two of the Leases contain virtually identical provisions relative to the method for calculation of the Additional Rent. They are the MHT 600 Fifth Avenue Lease and the Chemical 30 Rockefeller Plaza Office Lease.[8] The MHT 1230 Avenue of the Americas Lease contains minor differences noted in the footnotes. Article 24(g) of the MHT 600 Fifth Avenue Lease provides:

"(g) 'Cost of Operation and Maintenance' shall mean the *actual cost* (including depreciation of all hand tools and other moveable equipment which is, or should be, capitalized on the books of the Landlord and the cost of hand tools and other movable equipment which need not be so capitalized, as well as the cost of maintaining all such hand tools and movable equipment)[9] *incurred by the Landlord with respect to the operation, maintenance and repair of the Center and the curbs and sidewalks adjoining the same, including, without limitation,* the cost incurred for air conditioning; mechanical ventilation; heating; cleaning[10]; rubbish removal; window washing (interior and exterior, including inside partitions); elevators; escalators; porter and matron service; electric current; steam; protection and security service; repairs; maintenance; fire, extended coverage, boiler, sprinkler, apparatus, public liability and property damage insurance; supplies; wages, salaries, disability benefits, pensions, hospitalization, retirement plans and group insurance respecting service and maintenance employees; uniforms and working clothes for such employees and the cleaning thereof; expenses imposed pursuant to any collective bargaining agreement with respect to such employees; payroll, social security, unemployment and other similar taxes with respect to such employees; sales, use and other similar taxes; water rates; and sewer rents;[11] *provided, however, that the term 'Cost of Operation and Maintenance' shall not include* * * *(2)* * * * the cost of any item which is, or should in accordance with sound accounting practice be, capitalized on the books of the Landlord * * * (4) the cost of any work or service performed in any instance for any tenant of space in the Center (including the Tenant) at such tenant's cost and expense to the extent that such work or

---

7. The complete text of Article 24 in each Lease is included in Appendices A–D to Amended Joint Statement.

8. It is worth pointing out that these lease provisions are virtually identical even though the leases were executed well prior to the merger of MHT and Chemical.

9. The parenthetical clause is not in the MHT 1230 Avenue of Americas Lease.

10. The MHT 1230 Avenue of Americas Lease includes the words "interior and exterior" before "cleaning".

11. The MHT 1230 Avenue of Americas Lease includes the following language at this point: "charges of any independent contractor who does any work with respect to the opera-

tion, maintenance and repair of the Center and the curbs and sidewalks adjoining the same, and the annual depreciation or amortization over the useful life thereof of costs, including financing costs incurred for any equipment, device or other capital improvement made or acquired which is either intended as a laborsaving measure or to effect other economies in the operation, maintenance or repair of the Center and said curbs and sidewalks provided that the annual benefits anticipated to be realized therefrom are reasonably related to the annual amount to be amortized or which is required by any change in laws, ordinances, rules, orders or regulations of governmental authorities or insurance bodies".

service is in excess of any work or service which the Landlord is obligated to furnish hereunder to the Tenant at the Landlord's cost and expense, (5) the cost of any work or service performed for any other tenant of space in the Center at the Landlord's cost and expense to the extent that such work or service is in excess of any work or service which the Landlord is obligated to furnish hereunder to the Tenant at the Landlord's cost and expense, or (6) any cost incurred with respect to any theater or garage located in the Center * * *." (Emphasis added).

14. The MHT 30 Rockefeller Plaza Branch Lease uses the RAB Labor Rate, a term defined in the lease, as the basis of its Additional Rent calculations:

"*Adjustments for Changes in Landlord's Costs and Expenses.* If the sum of the Square Foot Share of the Real Estate Taxes for any Computation Year plus 48% of the RAB Labor rate for such Computation year shall be greater (resulting in an excess) or shall be less (resulting in a deficiency) than the sum of the Square Foot Share of the Real Estate Taxes for the Base year plus 48% of the RAB Labor rate of the Base Year, *then promptly after the Landlord shall furnish the Tenant with an Escalation statement relating to such Computation year the Tenant shall, in case of such an excess, pay to the Landlord, as additional rent for the premises* for such Computation Year, an amount equal to the product obtained by multiplying such excess by the Tenant's Area or the Landlord shall, in the case of such a deficiency, pay to the tenant an amount equal to the product obtained by multiplying such deficiency by the Tenant's Area." *Emphasis added.*

15. There is no dispute that MHT and Chemical received the Escalation Statements for the four Leases at or shortly after the date on each Escalation Statement. The Escalation Statements for the

years 1989 through 1993 were dated as follows:

| Lease Year | Date of Escalation Statements |
|------------|-------------------------------|
| 1989 | 3/31/90 |
| 1990 | 3/20/91 |
| 1991 | 2/19/92 |
| 1992 | 2/16/93 |
| 1993 | 2/15/94 |

Lease Years 1989 and 1990 predate the MHT–Chemical merger.

16. The annual Escalation Statements were simple one page documents which showed the multipliers for real estate tax and operating expenses, the square footage of the space and the amount of Additional Rent actually paid during the Lease Year as against the final amount due. No details or backup information was included with the Escalation Statements. *See* Carroll Affidavit at Exhibit 9.

17. As of the Filing Date, Chemical and/or MHT had been in possession of the (i) 1993 Escalation Statements since about February 15, 1994, or for over 1 year; (ii) 1992 Escalation Statements since about February 16, 1993, or for over 2 years; (iii) 1991 Escalation Statements since about February 19, 1992, or for over 3 years; (iv) 1990 Escalation Statements since about March 20, 1991, or for over 4 years; and (v) 1989 Escalation Statements since about March 31, 1990, or for over 5 years. Chemical and/or MHT had paid estimated Additional Rent during the course of each lease year based on the final amount of the Additional Rent for the preceding calendar year. In addition, Chemical and/or MHT had paid all of the amounts due under all of the 1989–1993 Escalation Statements by June 1994. For lease years 1990 through June 1994, MHT and/or Chemical paid over $15 million in Additional Rent for the leased space at 600 Fifth Avenue and over $11 million in Additional Rent for the leased space at 30 Rockefeller Plaza. Chemical did not put forth in the Proof of Claim any allegations nor has Chase supplied any affidavits in opposition to the motion for partial summary judgment that reflect that the Additional Rent was paid by mistake or inad-

vertence. Chase made no allegations of actual fraud in its Proof of Claim nor has it put forth any evidence of fraud in its response to the motion for partial summary judgment.

18. Neither Chemical nor MHT ever performed an audit of any of the Escalation Statements for the lease years 1989 through 1993 prior to the Filing Date or thereafter prior to filing the Proof of Claim. Chemical and MHT had been receiving Escalation Statements for many years before 1989, since the MHT 600 Fifth Avenue Lease commenced in 1980, the Chemical 30 Rockefeller Plaza Office Lease commenced in 1979 and the MHT Rockefeller Plaza Branch Lease commenced in 1972. The only lease of recent origin was the MHT 1230 Avenue of the Americas Lease which commenced in 1989 and that lease is the lease that fixed a base amount rather than a base year.

### Audit Rights

19. The Chemical 30 Rockefeller Plaza Office Lease provided that the tenant had a right following its receipt of any Escalation Statement to perform an audit within the next six month period. In addition, there was a provision that the landlord was only required to preserve related documentation for at least one year after the end of each computation year. The Lease states:

> "When requested by the Tenant within 6 months following the receipt by it of any Escalation Statement, the Landlord, in substantiation of the amounts set forth in said Escalation Statement, will furnish to the Tenant such additional information as reasonably may be required for such purpose, and, as may be necessary for the verification of such information, will permit the pertinent records, data and material relating thereto of the Landlord to be examined by an employee of the Tenant or by such independent certified public accountant as the Tenant may designate, it being expressly under-

stood that the landlord shall be under no duty to preserve any such records, or any data or material related thereto, beyond such time as shall be its customary practice with respect thereto, but, notwithstanding the foregoing, the Landlord will preserve all such records, data and material relating to any Computation Year for at least one year after the end of such Computation Year."

*See* Appendix C to Amended Joint Statement, Rider S.

20. The MHT 1230 Avenue of the Americas Lease provided a no interest grace period should MHT have requested information substantiating the Escalation Statements. The relevant provision states:

> " * * * If any fixed rent, additional rent, percentage rent (if any) or damages payable hereunder by the Tenant to the Landlord is not paid when due as in this Lease provided (except as to any portion thereof as to which an honest dispute exists as to the Tenant's Liability therefor), the same shall bear interest * * * from the due date thereof until paid and the amount of such interest shall be deemed additional rent hereunder (See Rider 'I' attached to this Lease)* * *."

Rider I states:

> "Provided, however, that, if promptly after the receipt of a bill for any additional rent the Tenant shall request the Landlord to furnish the Tenant with information reasonably substantiating the amount of such additional rent, then such interest shall not start to accrue until 5 business days until after the Landlord has furnished the Tenant with such information."

*See* Appendix D, Article 23 and Rider I to Amended Joint Statement.

21. The other two Leases contain no express audit or grace period provisions.

22. Edward M. McDermott, then an Assistant Vice President of Chemical[12],

---

**12.** In his Affidavit, McDermott states that he

has been employed by Chase for over 6½

was responsible for overseeing and approving the payment of invoices for operating expense escalation items charged to Chemical (and its predecessor, MHT after the 1991 merger) in respect to the Leases under which Chemical and MHT were tenants at Rockefeller Center.[13] *See* Affidavit of Edward McDermott, sworn to on January 23, 1997, in opposition to the Reorganized Debtors' Motion for Summary Judgment ("McDermott Affidavit")(Case Doc. No. 826).

23. On December 4, 1992, McDermott, on behalf of Chemical, sent a letter addressed to Desmond Lawe, the Director of Billing and Collections for Rockefeller Center Group, Inc. in regard to the MHT 600 Fifth Avenue Lease, which stated:

"You are hereby notified that your invoice(s) for operating expense escalations for the years 1991 and 1992 are rejected. Furthermore we contest the escalation payments *already paid* for the year 1990. *We believe the charges in total are inappropriate due to the fact that the space has been vacant for the past three years.*

We reserve the right to conduct an audit of your books to ascertain the actual expenses incurred on our behalf. Until such time that we hear from you to make arrangements to do so, we cannot process the invoices for payment. Meanwhile, kindly note that time is of the essence." (Emphasis added). *See* McDermott Affidavit at Exhibit D.

The letter made no reference to operating expense escalations for any lease other than the MHT 600 Fifth Avenue Lease. Nor does the McDermott Affidavit indicate whether McDermott had reviewed the pertinent terms of the MHT 600 Fifth Avenue Lease before sending the letter. Nothing in the McDermott Affidavit states that he received any reply to his December 4 letter. Moreover, Chase has failed to put forth any evidence that McDermott or any other of its employees took any further action to follow up after McDermott sent the December 4, 1992 letter to Lawe.

24. In June 1994, Chemical issued three checks to the Reorganized Debtors aggregating approximately $1.1 million, only two of which relate to the Leases. One was a check for $994,845.67 for the operating expense escalations due for the premises leased under the MHT 600 Fifth Avenue Lease, which space McDermott had stated in his December 4, 1992 letter was vacant and which space was presumably still vacant in June 1994. The second check, for $101,512.28, was to pay the amount due because of Chemical's apparently inadvertent underpayment of monthly escalation billings under the MHT 30 Rockefeller Plaza Branch Lease.[14] Each check was marked "Paid under Protest." McDermott's transmittal letter accompanying the checks stated that the "checks are marked 'Paid under Protest' and in no way constitute the Bank's acceptance of the escalations as billed, nor does it waive any of the Bank's rights under the lease." McDermott Affidavit at Exhibit E.

25. Neither the June 1994 protest payments nor the accompanying transmittal letter identified any specific issues of objection. As to the $994,845.67 "protest" payment with respect to the MHT 600 Fifth Avenue Lease, the objection presumably was that the premises were vacant as

years. However, it is clear from the exhibits attached to his Affidavit that McDermott retained his position after the merger between Chemical and Chase and that during the lease years in question he was employed by Chemical first as the Director of Property Management Resources and later as an Assistant Vice President, responsible for the payment of operating expense invoices with respect to the Leases.

13. By 1992 Chemical and MHT had merged and Chemical became the tenant under the MHT Leases. *See* Finding 6.

14. The third check was for $51,089.63 for branch space at 1271 Avenue of the Americas, which is a building in which the Reorganized Debtors did not hold an interest and as to which no claim was asserted in the Proof of Claim.

expressed in the December 1992 letter. As to the $101,512.28 "protest" payment with respect to the MHT 30 Rockefeller Plaza Branch Lease, no substantive objection to the escalation calculation has been shown to have ever been specified by Chemical. Moreover, there has been no evidence submitted by Chase that any objection had been raised by either MHT or Chemical prior to the filing of the Proof of Claim to (i) any of the Additional Rent paid under the MHT 1230 Avenue of the Americas Lease; (ii) any of the Additional Rent paid under the Chemical 30 Rockefeller Plaza Office Lease; (iii) any of the Additional Rent under the MHT Rockefeller Plaza Branch Lease, with the exception of the "protest" marked on the $101,512.28 check; or (iv) any of the Additional Rent paid under any lease for lease year 1989.

26. The Proof of Claim does not identify or specify the nature of any overcharges in the Additional Rent paid under any of the Leases. In its opposition to the partial summary judgment motion, Chase offers a report prepared by the accounting firm of BDO Seidman, L.L.P *after* the Proof of Claim was filed (the "BDO Seidman Report").[15] The BDO Seidman Report concludes that Chase was overcharged at an annual rate of at least $2 per square foot for operating expense escalations during the pendency of each of the Leases from 1989 through July 17, 1996, the effective date of the confirmed plan. *Pappas Affidavit* at ¶ 4. Chase asserts that these overcharges were the result of the Reorganized Debtor's miscalculation of the final Additional Rent due under each of the Leases. *Id.* Chase, in reliance on the

BDO Seidman Report, has categorized the areas as to which it believes it has been improperly overcharged in the Additional Rent calculations. These categories include:[16]

a. *Misallocation of Corporate Overhead:*

The BDO Seidman Report states that in 1978 (the Base Year under the Chemical 30 Rockefeller Plaza Office Lease), only four categories of corporate overhead, aggregating approximately $295,000, were allocated to property operations and charged to tenants of Rockefeller Center as Additional Rent. By 1994, it states that there were 28, out of 32 listed categories, of corporate overhead, aggregating approximately $2,000,000 which were charged to the Center's tenants. Chase asserts that these overcharges include, *inter alia*, (i) management salaries of $363,000 in 1990 and $34,000 in 1993; (ii) stationery expenses of $124,000 in 1990 and $243,000 in 1993; (iii) travel and entertainment expenses of $52,000 in 1990 and $25,000 in 1993; and (iv) office furniture and equipment of $11,000 in both 1990 and 1993.

b. *Improper Capital Costs:*

The BDO Seidman Report shows that by 1995 there were 31 capital cost items, which Chase asserts demonstrates overcharges totaling $472,860 including, *inter alia*, (i) $81,187 for the fabrication and installation of 55 new awning covers for the retail tenants; (ii) $76,999 in labor costs for various projects, including costs associated with the Rainbow Room restaurant, sidewalk replacement and the reset-

---

15. Parts of the BDO Seidman Report are attached as Exhibits 2, 3 and 4 to the Affidavit of Michael E. Pappas, Senior Managing Director of Corporate Real Estate Services for BDO Seidman, L.L.P., sworn to on January 23, 1997 (the "Pappas Affidavit")(Case Doc. 826 as attached to the McDermott Affidavit).

16. The following list was compiled from the information contained in the Amended Joint Statement as well as from the BDO Seidman Report. The court notes that except for the

category of Misallocation of Corporate Overhead which includes Chase's calculations for the years 1990 and 1993, the other categories are based on 1995 information, a year not at issue herein. Due to the limitations on discovery and for purposes of this decision the court accepts the 1995 information as representative of the items which Chase believes were inappropriately included in the Additional Rent calculations for the earlier years which are at issue.

ting of stone work on the north and south facade of the Buildings; (iii) $13,676 for an elevator alteration project; (iv) $5,005 for a new kitchen door; and (v) $376 for copies of all Rockefeller Center CAD library drawings.

### c. *Costs relating to Radio City Music Hall and Garage or Unrelated Building Expenses*

The BDO Seidman Report sets forth 7 alleged overcharges totaling $6,381 which include (i) $2,662 for a garage area paint job; (ii) $1,800 for pump maintenance service fees at Radio City Music Hall; (iii) $570 for an on site inspection at 1221 Avenue of the Americas; (iv) $445 for an on site fire safety detector test at 1251 Avenue of the Americas; (v) $445 for on site inspection of 1211 Avenue of the Americas; (vi) $249 for a truck rental/Music Hall warehouse and (vii) $210 for a permit for garage air conditioning.

### d. *Other Miscellaneous Costs*

Chase sets forth 39 miscellaneous alleged overcharges which include, *inter alia* (i) $18,943 for skating rink plantings; (ii) $6,168 for seminar fees (iii) $3,760 for executive country club memberships; (iv) $2,386 for flower arrangements; (v) $500 in funeral arrangements; (vi) $319 for Christmas party invitations; and (vii) $107 for tuxedo rentals. Other expenditures in this category also include the costs associated with the annual world famous Rocke-

feller Center Christmas Tree display which averaged $415,000 per year from 1989 through 1995.[17] The costs associated with landscaping the gardens and the annual Christmas tree display increased from $194,000 in 1978 to $1,627,000 in 1995 (an increase of 739%).

### e. *General Increase in Operating Expenses*

When compared to Rockefeller Center's 1978 operating costs and expenses of $27,374,000 increased by $54,507,000 to $81,881,000 in 1993.[18] Pappas stated that the Reorganized Debtors' operating expenses were "almost double the industry average" during the 1989–1994 period. Pappas Affidavit ¶ 12. He further maintained that "[n]ot only are these amounts particularly disconcerting in and of themselves, but what is truly alarming is the amount and rate of increase from 1978–1989. Over this eleven year period, the rate of increase in the Center's operating expenses were more than double the rate of inflation." *Pappas Affidavit* at ¶ 13. Finally, in Pappas' opinion, "[m]any, if not all, of these expenditures are not allowable operating expenses pursuant to the terms of the Lease and/or general real estate industry practice." Pappas Affidavit ¶ 17.

### *Discovery*

27. The following documents, among others, were produced by the Debtors or Tishman in connection with this contested matter, and have been reviewed by or on

---

**17.** This court notes that Chase's objection to being assessed a share of the costs associated with annual Christmas Tree display is not a novel one. In 1992 Rockefeller Center tenant Jerome Kretchmer and Company made the same argument before the Supreme Court of the State of New York. *Jerome Kretchmer and Company, Inc. v. Rockefeller Center Properties*, 1992 Lexis 682 (N.Y.Sup.Ct.1992). In *Kretchmer* the plaintiff argued that the cost of the annual Christmas Tree was improperly billed to tenants and that such costs were not within the scope of the landlord's "cost and operation" of Rockefeller Center as set forth in the plaintiff's lease. The court held "as a matter of law" that the lease language of "operation, maintenance, and repair" did include the cost of the annual Christmas Tree. *Id.* at *5. The *Kretchmer* court went on to state that "[t]he

Rockefeller Center Christmas tree is a highly publicized, traditional event since 1932. It should come as no surprise * * * that paying for the tree is part of the 'operation' of Rockefeller Center as provided for in the lease * * *." *Id.*

This court also notes the irony of Chase making this argument since its long time premerger chairman David Rockefeller was often the person responsible for lighting the Christmas Tree during an annually televised event.

**18.** This comparison states nothing beyond the obvious and the information was available to MHT and/or Chemical from its own records reflecting the Additional Rent history under the Leases.

behalf of Chase: cost studies for Base Years 1978 and 1979, escalation cost studies for the years 1989–1995 and January 1, 1996 through July 17, 1996, trial balances, general ledgers for the years 1989–1994, department cost analyses for the years 1978–1980, the transaction sales register for 1995 and vendor invoices for the years 1995 and 1996 (from January 1, 1996 to July 17, 1996).

28. On June 17, 1997, in response to Chase's first and second requests for the production of documents, the Debtors produced 279 pages of Bates-stamped documents, consisting of (a) the MHT 600 Fifth Avenue Lease, (b) correspondence between the Debtors and Chase, (c) a 1995 survey of certain lighting, electrical equipment and HVAC costs at 600 Fifth Avenue, (d) certain combined financial statements of the Debtors for the years ended 1992 through 1995, (e) assorted documents relating to Chase's real estate tax refund claim and (f) 22 miscellaneous pages.

29. Many of the documents and files relating to Rockefeller Center had been put in storage by Tishman in a Pennsylvania warehouse. In May 1997 certain files related to the relevant lease years were destroyed by a fire at the warehouse.

## DISCUSSION

### Allowance of Claims

■ The allowance of claims is governed by Bankruptcy Code ("Code")

§ 502. Code § 502(a) states that a claim which is filed is deemed allowed unless a party in interest objects.[19] Once an objection to a claim is made the court, after notice and a hearing, is to determine the amount of the claim.[20] Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim. *See* 9 Collier on Bankruptcy, 15th Ed. § 3001.09[2]; *Matter of Fidelity Holding Co., Ltd.*, 837 F.2d 696 (5th Cir.1988); *In re Domme*, 163 B.R. 363 (D.Kan.1994).

■ When an objection to a claim is contested, a contested matter is created.[21] BR 9014 dictates the procedure to be followed in contested matters. A number of the rules found in Part VII of the Bankruptcy Rules which apply in adversary proceedings are made applicable to contested matters. BR 7056 which adopts FRCP 56 is made explicitly applicable. Chase has objected to the Reorganized Debtors' joinder of its objection to the Proof of Claim with a motion for partial summary judgment. While certainly unusual, the procedure adopted by the Reorganized Debtors actually provided Chase with more information about the nature of the objection made to its claim than the typical objection does.[22] The court can find no prejudice to Chase from the procedure adopted since consideration of a

19. BR 3001(f) provides:
"A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

20. The court is to allow a claim except to the extent that
"Such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable laws for a reason other than because such claim is contingent or unliquidated* * *" Code § 501(b)(1).
The court must look to state law to determine the allowability of a claim.

21. Although one might view an objection to a claim by itself as creating a contested matter,

the reality is that the vast majority of claims objections are uncontested.

22. This court does note that the procedure utilized by the Reorganized Debtors did have aspect this court does find objectionable. The Reorganized Debtors joined its objection to the Chase Claim and to the claim filed by the National Broadcasting Company with its motion for partial summary judgment with respect to both claims in a single document. These two claims while raising similar legal issues have been filed by wholly unrelated parties and stand or fall on their own facts. Separate papers as to each claimant would have much expedited the hearing and resolution of the objections.

motion for partial summary judgment is governed by well-established case law in addition to the explicit standards set forth in FRCP 56.

### Summary Judgment Standards

FRCP 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re CIS,* 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing that there exists a genuine issue of material fact. *Rule v. Brine,* 85 F.3d at 1011; *accord* FRCP 56(e). The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

The evidence favoring the nonmoving party must be more than merely colorable. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A mere scintilla of evidence is not enough to create a genuine issue of fact. *See id.* at 252, 106 S.Ct. 2505. There must be evidence upon which a jury may reasonably rely and a party may not escape summary judgment on the mere hope that something will turn up at trial. *Id.,* 106 S.Ct. 2505; *Ayers v. Pastime Amusement Company,* 283 F.Supp. 773, 793 (D.S.C. 1968); *In re General American Communications Corporation,* 63 B.R. 534 (Bankr. S.D.N.Y.1986). The court can consider the content of all submitted affidavits in determining whether a proponent's affidavit is sufficient to give rise to a dispute as to material issue of fact. FRCP 56(e); *In re CIS,* 214 B.R. at 118. However, the nonmoving party may not simply rely on speculation, conclusory allegations and mere denials to raise genuine issues of material fact. *Nat'l. Westminster Bank v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987); *United States v. 15 Black Ledge Drive,* 897 F.2d 97, 102 (2d Cir.1990)(bare denials are insufficient to create a genuine triable issue of fact). Moreover, the nonmoving party is required to put forth all of its evidence or risk the grant of the motion for summary judgment.

Of course it is essential in determining whether a fact is material to determine the appropriate legal doctrines, as they determine what facts must be proven to sustain a cause of action or defense. The doctrine of account stated relied on by the Reorganized Debtors may be established by way of summary judgment. *See, e.g., Kramer Levin Nessen Kamin & Frankel v. Aronoff,* 638 F.Supp. 714

(S.D.N.Y.1986); *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.,* 615 F.Supp. 426 (S.D.N.Y.1985); *In re Shea & Gould,* 198 B.R. 861 (Bankr.S.D.N.Y.1996).

### The Doctrine of Account Stated

Under New York law, an account stated is "an 'agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or another.'" *Kramer Levin,* 638 F.Supp. at 719 (*citing Chisholm–Ryder Co., Inc. v. Sommer & Sommer,* 70 A.D.2d 429, 431, 421 N.Y.S.2d 455, 457 (1979)); *see also Ally & Gargano,* 615 F.Supp. at 428. Under this doctrine, a party who receives an account is bound to examine it, and if that party admits that the account is correct, it becomes a stated account and is binding on both parties. *Id.; Lockwood v. Thorne,* 11 N.Y. 170, 174 (N.Y.1854); *Kay Collyer & Boose v. International Film Productions, Inc.,* 1985 WL 3962, *1 (S.D.N.Y.1985). Express assent to the account is not necessary. Such assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt. *Willard Helburn, Inc. v. Spiewak,* 180 F.2d 480, 483 (2d Cir.1950)("when an account * * * remains unquestioned for a reasonable time after its receipt that fact is evidence * * * that the account as rendered has been accepted as correct"); *Navimex S.A. De C.V. v. S/S "Northern Ice",* 617 F.Supp. 103, 106 (S.D.N.Y.1984); *Rosenman Colin Freund Lewis & Cohen v. Neuman,* 93 A.D.2d 745, 461 N.Y.S.2d 297, 298–99 (1st Dep't.1983). An agreement to pay an indebtedness may also be implied if the objecting party makes a partial payment. *Kramer Levin,* 638 F.Supp. at 720.

If an account stated is established, the agreement is binding on both parties and must be enforced at law, although an account stated "can always be opened upon proof of mistake or fraud." *American Home Assurance Co. v. Instituto Nacional De Reaseguros,* 1991 WL 4461, *3 (S.D.N.Y.1991). The doctrine of account stated may be raised by a plaintiff seeking to recover from an account obligor or by a defendant seeking to prevent the reopening of a paid account, as is the case here. As the Reorganized Debtors have made out a *prima facie* case for application of the account stated doctrine to bar recovery of the payments long since made to it, it is Chase who bears the burden of establishing that its Proof of Claim for the years 1989 through 1993 is not barred. *American Home,* 1991 WL 4461, *3.

Chase urges that it may reopen the amount of the Additional Rent paid under the four Leases for the five year period 1989–1993 because the Reorganized Debtors allegedly made mistakes in the calculation of the Additional Rent due. In the Proof of Claim Chemical failed to specify or identify any mistakes which it believed the Reorganized Debtors had made in the calculation of the Additional Rent. Chemical made no allegations of fraud. Rather, the Proof of Claim merely set forth the vague and conclusory allegation that Chemical had overpaid rent. Nor has Chase offered any factual affidavits in opposition to the motion for partial summary judgment which demonstrate that Chemical had knowledge of mistakes sufficient to reopen the paid accounts stated *prior to* filing the Proof of Claim. Chase appears to place virtually its entire opposition to the motion for partial summary judgment on the BDO Seidman Report which was not even prepared until after the Proof of Claim was filed.[23]

---

23. At oral argument, the court raised the question as to whether Chase's failure to specify any mistake or fraud in its Proof of Claim gave the court a basis to dismiss the Proof of Claim under FRCP 9(b), which provides:

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

[17] Alternatively, Chase seeks to defeat the Reorganized Debtors' account stated defense by arguing that it is not really seeking to adjust an account stated but rather it is suing for breach of contract based on the Reorganized Debtors' alleged breach of the Leases by the inclusion of improper charges in the calculation of the Additional Rent. Thus, Chase argues that its claims cannot be barred because they were asserted within the six year contract statute of limitation. *See* NYCPLR § 213(2). The court finds this line of argument unpersuasive since it is well settled in New York that the account stated doctrine bars breach of contract claims.

In *Marino v. Watkins,* 112 A.D.2d 511, 512, 490 N.Y.S.2d 917, 919 (3rd Dep't. 1985), the defendant attempted to defeat an account stated by asserting in a counterclaim that the plaintiff, the operator of an accounting agency, had breached the underlying services contract by her failure to obtain the prior approval of the defendant of her ad purchases and in failing to adhere to his guidelines. The Appellate Division rejected this attempt to evade the account stated doctrine and held:

> To pass muster under FRCP 9(b), allegations must specify the time, place, speaker and content of the alleged fraud or mistake so that the intent to defraud is evident. *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).
>
> Similar specificity is required in an action in the New York state courts. NYCPLR Rule 3016(b) provides:
>
>> "(b) Fraud or mistake. Where a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."
>
> A proof of claim is a special form of complaint against a debtor. Form 10 sets forth what is required in a proof of claim. What Form 10 requires is remarkably similar to FRCP 8(a)(2) which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 9, which is adopted by Bankruptcy Rule 7009 and applies to adversary proceedings, seems appropriately applied to proofs of claim as well.

"Having accepted and paid for plaintiffs services and having accepted and retained the bills for the unpaid services without objection for several months, and no equitable considerations to the contrary being present, plaintiff's account must be considered conclusive* * *. This determination renders the corporate defendant's counterclaim [for breach of contract] legally insufficient."

112 A.D.2d at 513, 490 N.Y.S.2d at 919. *See also American Home,* 1991 WL 4461, *5 n. 1 ("breach of contract is not available to defendant as a means to seek adjustment of an account stated"); *accord, Kramer Levin* (client's failure to object to account stated bars defense of inadequate representation in collection of suit by law firm). The court also finds that Chase cannot have a claim in quasi contract for money had and received, since quasi contract is not available where there is a written contract and the Leases are written contracts. *See Clark–Fitzpatrick, Inc. v. Long Island Railroad Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987).

In one bankruptcy case with respect to a complicated claim based on allegations of fraud and misconduct, the court required the claimant to refile the claim in the form of an adversary proceeding in order to bring some procedural regularity to bear on the issues so they could move forward to determination. *See In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 68 (Bankr.S.D.N.Y.1993) (Bankruptcy Rule 9014 held to grant discretion to court to direct parties to bring what would otherwise be a contested matter in the form of an adversary proceeding.) In this matter there is no necessity for the court to direct the commencement of an adversary proceeding.

Since there is a pending motion for partial summary judgment, this court need not determine whether the Proof of Claim would pass muster under FRCP 9. Whether or not Chase was required to plead fraud or mistake with particularity in its Proof of Claim, it is indisputable that it was required to put forth all of its evidence of fraud or mistake in opposition to the motion for partial summary judgment.

It is undisputed that Chemical and/or MHT (i) paid the estimated Additional Rent during each lease year; (ii) received and paid the amounts shown on the Escalation Statements; (iii) had bank officers responsible for examining the Escalation Statements; and (iv) never performed an audit of any of the 1989–1993 Escalation Statements which fixed the final amount of the prior year's Additional Rent. With the exception of a single letter in December 1992 in which Chemical objected to the operating expense escalation for the vacant space leased under the MHT 600 Fifth Avenue Lease, Chemical never even spoke of making an audit. Thereafter, in June 1994 Chemical tendered three checks marked "paid under protest." Although the largest portion of that tender related to the unoccupied space under the MHT 600 Fifth Avenue Lease, *see* Finding 24, the transmittal letter accompanying these checks did not identify the nature of any protest. In sum, with the exception of the objection to charges for the vacant space leased under the MHT 600 Fifth Avenue Lease, Chemical and/or MHT never made any substantive objection to any of the Escalation Statements issued during years 1989 through 1993 relating to the four Leases until the filing of the Proof of Claim.

*Chase Failed to Object to the Escalation Statements within a Reasonable Time*

 It is well settled that the court can determine on summary judgement what constitutes a "reasonable time" to object to a statement of account. *See Kramer Levin,* 638 F.Supp. at 720 (granting summary judgment where almost three years passed before a bill was questioned "such a period of silence—in which there was ample opportunity to object to the billing—amounts to an implied acquiescence to the stated account"); *Kay Collyer,* 1985 WL 3962 at *2 (granting summary judgment where "it is clear that [the defendant] cannot raise a genuine issue of fact with respect to this sum by now disputing what it acknowledged and assented

to before this lawsuit was commenced"); *Rosenman Colin,* 461 N.Y.S.2d at 299 (defendants "belated objections insufficient to raise genuine issues warranting denial of summary judgment"). *See also, Lockwood v. Thorne,* 11 N.Y. 170 (1854)("If this case rested upon the question of reasonable notice, I cannot doubt, but the lapse of nine months after receiving the account, before the commencement of the action, there having been made, in the meantime, no objection or complaint, would have been abundant to authorize the legal inference of acquiescence * * * ").

In determining what constitutes a reasonable objection period in this case, the Reorganized Debtors argue that parties' election of a six-month period in one of the leases, the Chemical 30 Rockefeller Plaza Office Lease, is the strongest evidence of the parties' expectations and that in light of this six month contractual audit right, Chase is estopped from denying that six months was a reasonable amount of time to object to any of the annual Escalation Statements. The Reorganized Debtors contend that it would be inconsistent for Chase to now claim that a contractual audit period of six months is unreasonable in light of its inclusion in one of four comparable leases. *See Chautauqua County Federation of Sportsmens Club, Inc. v. Caflisch,* 15 A.D.2d 260, 264, 222 N.Y.S.2d 835, 838–40 (4th Dep't 1962)("Generally speaking, a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action"); *Brownsville Community Council, Inc. v. Banco de Ponce,* 567 F.Supp. 849, 857–58 (S.D.N.Y.1983)("[h]aving accepted the considerable benefits of its contract with [third party defendant], plaintiff may not now deny a corresponding obligation * * * "). The Reorganized Debtors also point out that under the Chemical 30 Rockefeller Plaza Office Lease, the Debt-

ors were not even required to preserve the related records beyond "one year after the end of such computation year."

▮ Chase, on the other hand, argues that while there was an express audit right in one of the Leases, neither the absence or inclusion of an audit right in a lease precludes other remedies or limits its time to object to the Escalation Statements. In addition, Chase contends that the inclusion of the six month audit provision in the Chemical 30 Rockefeller Plaza Office Lease should not be read into any of the other Leases, which are silent as to audit rights. However, even though some of the Leases contained no explicit provisions for a tenant review of the data underlying the Additional Rent calculation, it is clear that New York's imputation of good faith and fair dealing into every contract would require a court to permit the review. *See Kalisch–Jarcho, Inc. v. New York,* 58 N.Y.2d 377, 448 N.E.2d 413, 461 N.Y.S.2d 746 (1983).

▮ Each of the Leases contain virtually identical provisions which clearly state that the estimated Additional Rent payments to be made during the lease year are due and payable "promptly" upon receipt of a bill from the landlord and that the final adjusting Additional Rent payment is also due and payable "promptly" upon receipt of the Escalation Statements. *See* Finding 12. Assuming the facts most favorable to Chase, the court finds that by waiting until the filing of the Proof of Claim in September 1995 to object to the 1989–1993 Additional Rent fixed in the Escalation Statements, Chemical and MHT did not make timely objections as required to preserve their rights. The court holds that no objection to the final amount of the Additional Rent fixed in the Escalation Statements and actually paid would be timely after the conclusion of the lease

year in which the Escalation Statement was rendered and that the account stated doctrine would preclude any recovery of the Additional Rent payments thereafter.[24] Firstly, any additional payment due under the Escalation Statement was required to be made *promptly* after the receipt of the statement, which would be eight to nine months prior to the end of the current lease year. Secondly, after the end of the current lease year, a new Escalation Statement needed to be prepared, the amount of the final Additional Rent fixed and the difference determined so that the Additional Rent could be fixed for that year and the estimated rent for the upcoming year could be established. By the Filing Date, all of the Escalation Statements which fixed the final amount of the Additional Rent for the years 1989–1993 had become accounts stated. *Navimex,* 617 F.Supp. at 106 (defendant's failure to object for 5 months to plaintiffs' summary statement of account was unreasonable and converted the bill into an account stated); *American Home,* 1991 WL 4461 (granting summary judgment where account debtor failed to object to quarterly account statement prior to litigation); *In re Shea & Gould,* 198 B.R. 861 (Bankr.S.D.N.Y.1996)(objection after 23 months was not timely); *Dreyer and Traub v. Rubinstein,* 191 A.D.2d 236, 594 N.Y.S.2d 257 (1993) (defendant who did not object to law firm's bill for over 1 year deemed to have accepted it); *Jim–Mar Corporation v. Aquatic Construction, Ltd.,* 195 A.D.2d 868, 870, 600 N.Y.S.2d 790, 792 (3rd Dep't 1993)(account stated found where plaintiff rendered an account 6 months before defendant voiced objection); *Parola v. Lido Beach Hotel, Inc.,* 99 A.D.2d 465, 465, 470 N.Y.S.2d 44, 46 (2d Dep't 1984) (defendant's failure to object to the amount due for 1 year after the first account was rendered created a presump-

24. This means that, for example, for Lease Year 1993, the Additional Rent became an account stated not later than December 31, 1994. Similarly, as to Lease Year 1994, which is not subject to the present motion, objection would be required not later than December 31, 1995, subject of course to any intervening bankruptcy requirement to file a proof of claim.

tion as to the account's validity); *Fink, Weinberger, Fredman, Berman & Lowell, P.C. v. Petrides,* 80 A.D.2d 781, 437 N.Y.S.2d 1 (1st Dep't 1981) (summary judgment was warranted against a defendant who offered no evidentiary allegations supporting his position that he had contested a bill issued over 1 year earlier); *L.K. Comstock & Co., Inc. v. Duffy,* 43 A.D.2d 704, 704, 350 N.Y.S.2d 9, 12 (2d Dep't 1973) (defendant's silence for many months effected an account stated).

*Chase's Payments Under Protest Do Not Operate as Blanket Objections*

■ Chase places significant emphasis on the fact that the $1.1 million in payments made to the Reorganized Debtors in June of 1994 were made with checks marked "Paid under Protest." *See* Finding 24. In reality, Chemical expressed no substantive protest at the time it made those payments. It can be assumed that the protest for the $994,845.67 check that related to the MHT 600 Fifth Avenue Lease was that expressed in the December 4, 1992 letter, i.e. that the space was vacant. The court holds that the Reorganized Debtors' acceptance of these checks merely prevented the Reorganized Debtors from taking the position that the payments in and of themselves constituted Chemical's acceptance of the escalations as billed. After it made the payments in June 1994, Chemical continued to be "bound to examine the statement and object to it, if objection there be." *American Home,* 1991 WL 4461, *3; *Chisholm–Ryder,* 421 N.Y.S.2d at 457. Chemical did not satisfy this obligation.

Eleven months passed between the June 1994 payments and the Filing Date and an additional four months passed before the Proof of Claim was filed. Nothing in Chase's response to the motion for partial summary judgment indicates any action

was taken during that period of any kind, such as conducting an audit, to follow up on the June 1994 "under protest" payments to spell out its objections with legally sufficient detail. The "under protest" language seems to have been nothing more than a hollow, symbolic protest by Chemical at the need to keep paying for space it no longer required.

■ Under the account stated doctrine all items that could have been, but were not, disputed are deemed settled because "if certain items in an account [rendered] are objected to within a reasonable time, and others not, the latter are to be regarded as covered by such an admission" that is, that they are "prima facie correct." *Wiggins v. Burkham,* 10 Wall. 129, 77 U.S. 129, 19 L.Ed. 884 (1869); *Telebase Systems, Inc. v. Gateway Communications, Inc.,* 1988 WL 21845 (E.D.Pa. March 2, 1988) ("The law is settled that an understanding with respect to a portion of an open account may act as a partial account stated, to the extent of the understanding"); 1 Am.Jur.2d Accounts and Accounting § 28 at 586 (1994)("the mere fact that one or more items in an account are disputed does not prevent the account from becoming an account stated as to all the items admitted to be correct"). Chemical and/or MHT are not shown to have ever paid under protest or objected to (i) any of the Additional Rent for 1230 Avenue of the Americas; (ii) any of the Additional Rent paid for the two Leases for the office space and branch space at 30 Rockefeller Plaza[25]; or (iii) any of the Additional Rent paid for all leased space in 1989. Thus, it is indisputable that nothing more than the $994,845.67 and $101,512.28 could ever be in issue since none of the other Additional Rent payments were shown by Chase to have ever been disputed and were all paid. As to the only two items that were not paid until June 1994, as indicated previously, one of them appears not to be the

**25.** The $101,512.28 check marked "under protest," *see* Finding 24, did relate to one of the two 30 Rockefeller Plaza Leases. However it appears that this payment was made to

correct a prior inadvertent failure in implementing payments due under the Escalation Statements and nothing in the accompanying correspondence indicates any actual dispute.

subject of any actual dispute and the other became an account stated after payment by virtue of the failure to take further action.

The court holds that all of the 1989–1993 Escalation Statements have become accounts stated.

**Chase has Failed to Establish Any Reason to Re–Open the Settled and Paid Escalation Statements**

■■■■ Chase argues that it can re-open the payments of the Additional Rent during 1989–1993 due to a number of "errors" it claims have been "recently discovered" by BDO Seidman in the computation of the Additional Rent. Chase attributes these errors to (i) the Reorganized Debtors' accounting methods and (ii) the improper inclusion of certain operational expenses. It was always available to Chase and its predecessors to prepare retrospective analyses to determine the actual amount and rate of change in the Escalation Statements and to request further information of the Reorganized Debtors. It did not need an outside accountant to come in years later to do this. Moreover, the Leases provided for the Reorganized Debtors to charge the tenants with their pro rata share of the increase from their respective Base Years of the *"actual cost* * * * incurred by the landlord with respect to the operation, maintenance and

repair of [Rockefeller] Center." (emphasis added). Although certain permitted operating expenses are explicitly listed in the Leases, the Leases provide that the list is not exhaustive. *See* Findings 13 and 14. The court finds that even if Chase is correct, it has waited too long and has not sufficiently pled its case to challenge the settled and paid 1989–1993 Additional Rent under the four Leases. The account stated doctrine precludes all disputes except for the narrow category of factual mistakes or fraud. *American Home,* 1991 WL 4461, *3. Chase has failed to meet its burden in establishing the sort of mistakes cognizable in law to support an adjustment of the stated accounts.[26]

*Chase Failed To Make An Effort To Determine Its Obligations*

Chase argues that it paid the alleged overcharges because at the time the Escalation Statements were rendered, "Chase was unaware of (and had no reason to be suspicious of) the * * * overbilling practices of RCP. * * * Chase had no reason to distrust its landlord; and it assumed that the bills sent by RCP were calculated in accordance with the Leases" and that "Chase has only recently become aware of the scope and magnitude of the overcharges it paid the debtors." McDermott

---

26. Another limitation on the ability to rebut or impeach an account stated is that once a failure to object gives rise to an account stated, the objecting party may no longer contest the accounting method which was used throughout the relationship without protest. The objecting party in such circumstances is limited to proving factual mistakes within the context of an accounting method it is no longer entitled to challenge. *American Home,* 1991 WL 4461, *3; *Navimex,* 617 F.Supp. at 106. Even if the objecting party succeeds in showing that more restricted sort of error, its effect is to entitle it to an appropriate adjustment in the account stated; such errors do not operate to bar the entire account stated. *Id.*

While the court need not reach this issue, the court notes that even assuming that the Reorganized Debtors did erroneously charge to overhead some of the items Chase sets

forth, and many of those identified are *de minimus*, in most sophisticated transactions there will always be some undetected errors or differences in opinion concerning an accounting. Moreover, when the parties' relationship extends over a long period of time, as it has with these Leases, it is not unusual for accounting categories and styles to change with the changes in personnel and management. However, such an attack is not enough to allow a settled account to be re-opened. The law is clear that a court will not dismiss an account stated merely because the accounts are not perfect in every respect. *Navimex,* 617 F.Supp. at 105 ("[e]ven if the [objecting party] succeeds in showing that more restricted sort of error [a factual mistake], its effect is to entitle [it] to an appropriate adjustment in the account stated; such errors do not operate to bar the entire claim of an account stated").

Affidavit at ¶¶ 16 and 17; Chase's Memorandum in Opposition to Debtors' Motion for Partial Summary Judgment at p. 6. Chase states that because the Escalation Statements only set forth the square footage upon which the Reorganized Debtors made their calculations and do not refer to the composition or calculation of the cost escalation, which facts they claim "are uniquely within the Debtors possession and control" Chase should be permitted to re-open and adjust the settled accounts. McDermott Affidavit at ¶ 16.

The Reorganized Debtors' respond that Chase has misapprehended the law and has grossly underestimated the limitations it faces as the party seeking to challenge the settled and paid accounts. The Reorganized Debtors point out that Chase has failed to put forward any facts showing that the Reorganized Debtors made intentional misrepresentations or committed fraud in calculating the Additional Rent under the Leases. Moreover, Chase's claim that it did not have full knowledge of the facts is disingenuous because Chase's predecessors are not shown to have made any effort to determine what the facts were until years after receipt of the Escalation Statements and after the filing of the Proof of Claim. Moreover, there is a certain irony in these allegations since the MHT 1230 Avenue of the Americas Lease actually fixed $16.195 per square foot as the base amount in 1989. Presumably MHT was satisfied in 1989 with that base number or it would not have entered to the Lease.

The Reorganized Debtors cite three cases to support their position: *ITT World Directories, Inc. v. CIA Editorial de Listas, S.A.*, 525 F.2d 697, 702 (2d Cir.1975), *In re Caldor, Inc.*, 217 B.R. 121, 135 (Bankr.S.D.N.Y.1998) and *Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 118 A.D.2d 532, 499 N.Y.S.2d 435 (1986).

In *ITT*, the Second Circuit upheld the dismissal of a complaint which sought restitution of an allegedly mistaken overpayment made by the acquirer of two corpora-

tions. In addition to a cash purchase price paid to the defendant, plaintiff was to make an "adjusting payment" based upon the tangible net worth of the purchased corporations according to Arthur Anderson & Co. Arthur Anderson provided audited balance sheets that were consistent with either a combined tangible net worth of approximately $500,000 or, taking into account certain accounting exceptions, only $140,000. The plaintiff paid the larger amount and later sued for restitution of all but $140,000 of the adjusting payment.

The Second Circuit identified the plaintiff's claim as one for "mistake in performance" under New York law and affirmed the dismissal of the claim for restitution, noting that:

> "[Plaintiff's] over payment may well have been the result not of a mistake but of a conscious decision to avoid [such time consuming procedures as] negotiation and arbitration." *Id.* at 702.

The Second Circuit concluded that the plaintiff's claim should be dismissed even assuming the plaintiff had overpaid by approximately $360,000 because "that [assumption] would establish only overpayment. It would not establish mistaken overpayment. That is what this case is all about." *Id.*

In *Gimbel Bros.*, Gimbels sought a declaratory judgment that it could properly set off $20,000 in "Sunday charges" that it had paid against future rents due under a lease for its store premises in the Cross County Shopping Center in Yonkers, New York. Although it had no duty to do so under its lease, Gimbels paid those charges which were assessed as fees by the landlord for opening the store on Sundays after the repeal of a prior ordinance that prohibited Sunday store openings. Gimbels claimed that it was entitled to restitution of the charges because they were made pursuant to a mistake of fact. The court rejected that argument, finding that the "payments of $825 per Sunday were made voluntarily, without protest, and that

no mistake of fact was involved." 118 A.D.2d at 534, 499 N.Y.S.2d at 435. It then considered whether Gimbels was entitled to restitution under the theory that such payments were made pursuant to a mistake of law:

> "The traditional rule is that a voluntary payment made with full knowledge of the facts cannot be recovered because it was made pursuant to a mistake of law * * *. The harshness of this absolute rule was ameliorated by the enactment of CPLR 3005, which provides that 'when relief against a mistake is sought in an action * * * such relief shall not be denied merely because the mistake is one of law rather than fact * * *' However, in *Mercury Mach. Importing Corp. v. City of New York*, 3 N.Y.2d 418, 429, 165 N.Y.S.2d 517, 144 N.E.2d 400 [ (1957) ], it was held that the foregoing statute "does not require that mistakes of law shall be treated in all instances as though they were mistakes of fact." Clearly, then, a party is not automatically entitled to relief simply because that party acted under a mistake of law * * *. *[W]e find that the weight of the evidence supports the conclusion that Gimbels was not operating under an actual mistake of law but, instead, made the subject payments voluntarily, as a matter of convenience, without having made any effort to learn what its legal obligations were. * * * Gimbels displayed a marked lack of diligence in determining what its contractual rights were, and is therefore not entitled to the equitable relief of restitution.*"

*Id.* at 535–36, 499 N.Y.S.2d at 435 (*emphasis added*).

In *Caldor*, a chapter 11 debtor commenced an adversary proceeding to recover alleged overpayments to its landlord of additional rent under a commercial lease. The court granted summary judgment to the landlord dismissing the debtor-tenant's complaint, stating:

> "We find *Gimbel* to be persuasive in illustrating the difference between mistakes in fact and mistakes in law as they apply to payments mistakenly made under a lease. That court held that Gimbels' mistake regarding its contractual duty to pay Sunday charges was a mistake of law rather than of fact. 118 A.D.2d at 535, 499 N.Y.S.2d 435. It refused to mitigate the apparent harshness of this result in light of its conclusion that 'Gimbels displayed a marked lack of diligence in determining what its contractual rights were, and is therefore not entitled to the equitable relief of restitution.' "

*Id.* at 536. *Caldor*, 217 B.R. at 138.

■ The court finds that Chase has displayed the same "marked lack of diligence" with respect to determining what its contractual rights and obligations under the Leases were. Chemical's officer responsible for reviewing the Additional Rent and Escalation Statements admitted that he received and paid the invoices for years without requesting substantiation or an audit. Nowhere is there any indication that he reviewed the Leases themselves. No affidavit from any MHT officer was submitted relative to what was done by MHT in the pre-merger years. The only invoices Chemical ever questioned related to vacant space and it failed to follow up on its initial suggestion of an audit and eighteen months later made payment in the amount of almost $1 million, hardly a trivial amount not worth following up on if any legitimate issue existed, which amount paid the open issues in full. Chase argues it was unaware of any "errors" in billing until 1995. The court finds that the only reason that Chase "did not have full knowledge of the facts" is because it made no effort whatsoever to determine what the facts were. It is not enough that Chase show an overpayment. Chase must show a mistaken overpayment which it has failed to do. Chase is not entitled to the equitable relief of restitution for the lease years 1989–1993 because of its marked lack of diligence.

### The Doctrine of Estoppel In Pais

 The doctrine of estoppel in pais bars an account debtor's claims "if the [account] debtor by its failure to object or inquire within a reasonable time places the creditor in a worse position than if timely protest or inquiry had been made." *American Home,* 1991 WL 4461 *3. It is hornbook law that an account stated may not be impeached where "some act has been done or forborne in consequence of the accounting and in reliance upon it, which would put the party claiming the benefit in a worse position than if it had not been had, so as to bring the case within the principles of estoppel in pais." *See* N.Y.Jur.2d Accounts and Accounting Sect. 22 at 173 (1979); Restatement (Second) Contracts Sect. 90 (1979).

 In the instant case, the Reorganized Debtors are prejudiced in a number of ways by the failure of Chemical and/or MHT to make timely objections to the Additional Rent calculations for 1989–1993. They conducted their operations based on the receipt of the Additional Rent and the monies paid have long been spent and incorporated into future revenue and expense projections. Fading memories and departed employees would make it difficult for the Reorganized Debtors to go back and review the Additional Rent calculations reflected in the Escalation Statements. These factors are all the more significant since the Reorganized Debtors no longer have any relation to the Property and no longer have custody of the supporting records, which are now held by Tishman Speyer, the managing agent for the now owner of the Property. To allow five years of stale accounting data to be reopened based on unspecified errors grounded merely on suspicion would severely prejudice the Reorganized Debtors.

Chase, Chemical and MHT were sophisticated tenants and had the financial and accounting expertise of money center banking institutions. The Reorganized Debtors were entitled to expect that after all the Additional Rent for a particular lease year was paid, any request for an audit would be made promptly and in any event not later than by the end of the lease year in which the Escalation Statement was received. Chase is barred by the doctrine of estoppel in pais from challenging the paid accounts stated because its failure to act in a timely fashion places the Reorganized Debtors in a substantially worse position than they otherwise would have been in.

### There is No Need for Further Discovery

Chase seeks to delay consideration of the Reorganized Debtors' motion for partial summary judgment until it has had completed discovery in respect of lease years 1989–1993 because "knowledge [of what went into the Additional Rent charges] is exclusively in the debtors' control." Transcript dated September 9, 1997 at 42. Chase has stood by silently for years and now seeks to launch a wholesale fishing expedition through more than ten years of accounting records before the motion for partial summary judgment can be considered. In making this request, Chase relies on FRCP 56(f).

FRCP 56(f) provides:

"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

 Chase has not filed a Rule 56(f) affidavit detailing what additional discovery is needed and why. The "failure to file an affidavit under Rule 56(f) is itself sufficient ground to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985).

In *Burlington Coat*, The Second Circuit held that FRCP 56(f) requires that the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion file an affidavit explaining:

"1. The nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

2. How those facts are reasonably expected to create a genuine issue of material fact; and

3. What efforts the affiant has made to obtain those facts; and

4. Why those efforts were unsuccessful." 769 F.2d at 926.

The court must also take into account whether the party seeking additional discovery is the plaintiff or the defendant. Here, Chase is effectively the plaintiff. Chase has not shown what efforts it made to obtain the facts necessary to support its own claim prior to the filing of the Proof of Claim. For example, Chase has not offered any evidence that explains how, prior to the filing of the Proof of Claim, it came to believe the calculations of the Additional Rent were wrong or even how the amount of the claim was calculated.

■ The burden of proof lies with Chase. It is a burden Chase must meet without resorting to discovery from the Reorganized Debtors, just as it would have had to had it commenced and action in state or federal court against the debtors. The fortuity of the filing the Chapter 11 cases does not result in a shifting of the burden of proof. The Additional Rent having been paid, it is Chase that it suing for its recovery, albeit through the mechanism of filing a proof of claim. It is Chase that must demonstrate sufficient diligence to overcome the repose the account stated doctrine creates.

■ Chase cannot rely on speculation that further discovery from the Reorga-

nized Debtors might uncover relevant evidence:

"[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover. 'An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion.'

\*　　\*　　\*　　\*　　\*　　\*

A 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative.'"

*Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 107 (2d Cir.1981) (citations omitted); *see also Paddington*, 34 F.3d at 1138 (discovery inappropriate where party opposing discovery seeks "to find out if it has a claim rather, than that it has a claim for which it needs additional discovery"); *Waldron v. Cities Service Co.*, 361 F.2d 671, 673 (2d Cir.1966)(denying Rule 56(f) discovery where "plaintiff sought to engage in still another 'fishing expedition' in the hope that he could come up with some tenable cause of action") aff'd. 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

When considering the Reorganized Debtors' motion for partial summary judgment, it is necessary to discuss the interplay between procedural and substantive law. In order to have an allowable claim, Chase must have a claim it could successfully establish under state law, as of the Filing Date. To file a suit, Chase would have had to comply with the requirements of FRCP 9 [27] which require the pleading of

27. Both Chemical and Manufacturers had knowledge on which to base an opinion about

the Additional Rent. They have been paying

fraud or mistake with particularity in order to overcome the account stated doctrine. Chase would also have had to have complied with similar standards under NYCPLR Rule 3016(b). Chase would not have been able to file suit and then seek to have discovery to uncover its case.

In the case at bar, Chase is speculating that additional discovery will turn up evidence of mistake or fraud, and therefore seeks to conduct an extensive and expensive fishing expedition to substantiate a mere hunch. Chase has actually had the benefit of some discovery and has failed to find mistake or fraud sufficient to take its claim outside of the barrier of the account stated doctrine. Chase has access to its own records and therefore needs no further discovery as to these records. In opposition to the motion partial summary judgment, Chase was required to put forward its best evidence. All it has offered is one 1992 letter and a 1994 payment "under protest" which was never followed up on.

The court concludes that Chase has failed to satisfy the procedural requirements of FRCP 56(f) and is thus not entitled to an extension of time to take the discovery. However, more significantly, this court concludes that even if Chase had fulfilled the procedural requirements of FRCP 56(f), it still would not have been entitled to take additional discovery before consideration of the motion for partial summary judgment. As the putative plaintiff in a case based on mistake or fraud, Chase was required to plead with particularity. In defense to a motion for partial summary judgment, Chase was therefore required to show to offer the particulars of mistake or fraud without resorting to discovery.

### CONCLUSION

For the reasons set forth above, the court finds that there are no material facts in dispute and the Reorganized Debtors'

the amount for years and had a full historical

motion for partial summary judgment is granted.

"However, disallowing Chase's Proof of Claim for years 1989–1993 without fixing the dollar amount by which the claim is reduced, leaves the amount of the claim undetermined. Therefore, in order that the amount of the Proof of Claim can be reduced to reflect this court's ruling, Chase is directed to file promptly a sworn affidavit setting forth the basis for the calculation of $7,827,512 set forth in the Proof of Claim."

Settle Appropriate Order.

record of the increased amounts.